IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| HARVEY J. KESNER | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-551-AKH |
| | ) | |
| | ) | **TRIAL BY JURY** |
| BAKER BOTTS, LLP | ) | **IS DEMANDED** |
| JONATHAN A. SHAPIRO, | ) | |
| LYNN NEILS, | ) | |
| DAVID LOCHER, | ) | |
| DAVID HANSEN AND | ) | |
| JOHN AND JANE DOES 1-10 | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# FIRST AMENDED COMPLAINT

Plaintiff, Harvey J. Kesner ("Kesner" or Plaintiff"), by counsel, pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure, files the following First Amended Complaint against Defendants Baker Botts, LLP ("Baker Botts"), Jonathan A. Shapiro ("Shapiro"), Lynn Neils ("Neils"), David Locher ("Locher"), David Hansen ("Hansen"), and John and Jane Does 1-10, jointly and severally.

Plaintiff seeks (a) compensatory damages, threefold damages and punitive damages in a sum not less than **$35,000,000.00**, (b) prejudgment interest on the principal sum awarded by the Jury from May 15, 2018 to the date of Judgment at the rate of nine (9) percent per annum, (c) reasonable attorneys' fees, and (d) costs – arising out of Baker Botts', Shapiro's, and Hansen's acts of racketeering activity in violation of Title 18 U.S.C. § 1962, and Baker Botts'. Shapiro's, Neil's, Locher's and Hansen's violations of General Business Law § 349 (prohibiting deceptive acts or practices in the conduct of any

1

business, trade or commerce), tortious interference with contract and business expectancies, intentional infliction of emotional distress, prima facie tort, and misconduct in violation of New York Judiciary Law § 487.

## **INTRODUCTION**

1.      This is a case about extortion and the illegal efforts of Baker Botts, Shapiro, Neils, Locher and Hansen to extract $9,600,000 from Plaintiff by force, threats and intimidation.

2.      MabVax Therapeutics Holdings, Inc. ("MabVax") was a fledgling biopharmaceutical company founded by Defendant Hansen, its Chief Executive Officer and director.  Hansen caused MabVax to become publicly traded in 2014 in a reverse merger transaction with a public company, Telik, Inc. ("Telik").  MabVax raised millions of dollars in capital for its operations and significant officer salaries never obtaining FDA approval for any of its treatments, never brought any product to market, nor realized any profits.  MabVax instead had significant losses throughout its history continually teetering on insolvency and finally filed for bankruptcy in 2019.  MabVax never progressed beyond FDA Phase I human clinical trials to Phase II or Phase III trials, and in February 2018 suspended patient enrollment after its drug suffered an "*adverse*" patient event.  MabVax never disclosed if the adverse event was a fatality or injury incident to its drug's use, but hid this important information from investors for over 6 months skipping required SEC filings.  MabVax/Hansen voluntarily decided to halt the trading in its stock on NASDAQ by failing to provide investor information though SEC filings rather than talk about its setbacks publicly.  It lost the confidence of investors and saw its stock price plunge.  In 2019, MabVax filed for bankruptcy and was liquidated.  MabVax and its management are facing a multitude of investor lawsuits.

3.      As of May 2018, attorney Jonathan Shapiro had been Defendant Hansen's personal attorney for at least 5 years.  Upon information and belief, Shapiro represented Defendant Hansen when, as founder of MabVax, he arranged for its acquisition by Telik.

4.      On or about May 15, 2018, Defendant Shapiro contacted Plaintiff in Plaintiff's New York office seeking a meeting with Plaintiff.  He thereafter emailed confirmation and scheduled a meeting for the following week in Plaintiff's New York law office.  After the call, Shapiro emailed Plaintiff "*Thank you for the call.  My contact information is below.  Please let me know what your calendar looks like next week, I'm best on Monday (or Tuesday) but to want to accommodate*."  Defendant Shapiro then emailed Plaintiff on May 16, 2018 "*Good Evening.  Just checking to see if I can get on your calendar.  Best, Jonathan*".

5.      Two attorneys, Defendant Shapiro and Defendant Locher, from the law firm of Baker Botts then traveled to New York City from their offices in California and Washington, D.C., respectively, to meet Plaintiff in his law office in midtown Manhattan on May 22, 2018.  Once there, they reviewed dozens of documents and interviewed Plaintiff's New York staff and other attorneys in Plaintiff's firm collectively for nearly five hours.  After the meetings Defendant Shapiro thanked Plaintiff writing in a further email "*Harvey and Robert, Thank you for your courtesy today, appreciate the help transitioning this as we move ahead with the defense.  Best, Jonathan*".

6.      While in New York, Defendants Shapiro and Locher received files in the Firm's New York office, interviewed Plaintiff and another attorney concerning MabVax and matters.

7.      Meanwhile, in February 2018, MabVax had been served with an SEC subpoena issued by the SEC's New York office.  Plaintiff's law firm was authorized to

3

and accepted service in New York.  Shortly thereafter, Defendant Hansen too received a personal subpoena from the SEC's New York office.  The subpoena queried matters ranging from information about investors and their investments in MabVax, their reporting of beneficial ownership of stock, and disclosures made by MabVax in its SEC filings and registration statements.

8.     The investment contracts requested by the SEC specify that they are deemed to be made and to be performed within the state of New York, and contain New York choice of law and venue provisions for disputes.  Since late-April 2015, all federal securities law filings made by MabVax were prepared by and filed by the attorneys from Plaintiff's New York office.  Defendant Hansen routinely travelled to New York to meet investors, analysts and attend conferences, to meet with Plaintiff, and to license technology from New York universities.

9.     On May 29, 2018 Defendant Shapiro sent a new letter and email to Plaintiff with questions from their New York meeting - "Please include those instances you mentioned *during our meeting* … and "*During our discussion* [in your New York office], you advised that, once SRFK undertook its representation of MabVax, those outside investors … obtained separate counsel with respect to their investment in MabVax.  Please identify those counsel, the MabVax-related transaction(s) in which they appeared, and the client/investor(s) they represented." "During his summary of the collection and production effort in response to the SEC subpoena . . . [] noted that [the firm] undertook an internal collection for responsive documents/data, which is common practice insofar as documents/data held by counsel [in New York] are typically deemed to be within the control of their clients.   …   Please identify the … [New York] custodians from whom documents/data were collected, and let us know where we can

locate them."

10.    During the hours-long meetings held in New York, Defendant Locher scrupulously transcribed the conversations on his laptop.   Confidential conversations between attorneys believed to be representing the same party in an SEC investigation - MabVax.   When Plaintiff objected to this recording in his New York office Defendant Shapiro dismissed Plaintiff's objection and directed Mr. Locher to continue to record the meetings.

11.    Defendant Shapiro repeatedly represented both orally and in writing that his purpose was solely to assist *MabVax*, his client.   He confirmed in letters and orally that he was serving as Plaintiff's successor and his co-counsel to prepare to defend an SEC subpoena and investigation *of MabVax*.

12.    However, as is now known Shapiro had other things in mind.   His prior firm, Mintz Levin, had issued a press release on April 29, 2013 heralding Defendant Shapiro's appointment to that firm.   Plaintiff had no idea that Defendant Shapiro was directly involved in the prior representation of MabVax as its counsel at Mintz Levin, on the very matters that are at the heart of the SEC investigation, fashioning corporate documentation, and SEC reporting for the transactions with MabVax' investors and for the period of time identified by the SEC in which the wrongdoing occurred investigated by the SEC.   He did not reveal his *actual* purpose was to protect and disguise his firm's involvement and connection to the reporting at issue at his prior firm.   He did not reveal that improprieties at that firm could be charged by the SEC in the investigation.   *Nor did he disclose he and his firm represented Defendant Hansen, founder and CEO of MabVax, personally*.   From at least 2013-2016 he was a senior partner at the law firm that handled all of the corporate and SEC matters for MabVax– the very period investigated by the

SEC.

## Mintz Builds on Momentum in San Francisco with Addition of Corporate Litigator Jonathan A. Shapiro

Building on its recent momentum in San Francisco, Mintz, Cohn, Ferris, Glovsky and Popeo, P.C. announced that Jonathan A. Shapiro, an experienced corporate and securities litigator formerly of Wilmer Hale, has joined as a Member and the Head of the firm's West Coast Litigation Practice.  He is the fourth new Member to join the San Francisco office in the last month.

Having established and expanded Wilmer Hale's West Coast securities department, Mr. Shapiro further strengthens Mintz corporate capabilities in the Bay Area and beyond, with a practice focused on complex business and securities litigation as well as government enforcement actions.

13.     Prior to the meetings in New York, on or about May 8, 2018, unbeknownst to Plaintiff, MabVax had already engaged Defendant Baker Botts.

14.     At the time he appeared in Plaintiff's New York office it is now evident he was representing Defendant Hansen and protecting his prior firm and himself in a deeply conflicted un-waivable conflict of interest situation between his duties as counsel to MabVax, an entity being investigated and potentially charged, and his duties with conducting an impartial internal investigation *of Defendant Hansen when his very firm itself (Mintz Levin)* had been responsible for the very SEC filings and reports under investigation.  These facts later revealed show his fatally flawed allegiances would have prevented any representation of any party – not MabVax – not Hansen – and not Mintz Levin  – in an internal investigation.  Where were the general counsel and ethics officers of Baker Botts and Mintz Levin to review the matter and guide him away from such blatant violations of attorney ethics?  They all took a back seat in this cover-up and hid the true motivations were self-protection and self-preservation, not the conduct of an

impartial internal investigation.  His behavior also indicates a deep divide and conflict of interest between his duties to both clients while the SEC was looking at them for potential violations of SEC reporting – the very SEC filings and documents his prior firm would have prepared during his tenure.  Had Plaintiff been informed of the truth, he would have refused to meet with Defendants and insisted MabVax assign independent counsel.  All attorneys owe a duty of candor to other attorneys with which they are dealing.

Upon information and belief, the following table summarizes the periods of representation giving rise to Defendant Shapiro's conflicts with the SEC investigation:

| Name | Client | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|
| Shapiro/*Mintz Levin* | MabVax | X | X-S | X-S | X | | | | |
| Shapiro/*Baker Botts* | MabVax | | | | | | X | X | X |
| Glazer/*Mintz Levin* | MabVax | X | X-S | X-S | X | X | X | X | X |
| Shapiro/*Mintz Levin* | David Hansen | X | X-S | X-S | X | | | | |
| Shapiro/*Baker Botts* | David Hansen | | | | X | X | X | X | X |
| Shapiro/*Baker Botts* | Mabvax Special Committee[1] | | | | | | X | | |
| | | | | | | | | | |
| 1 = Resigned 7/31/18 | | | | | | | | | |
| S = SEC investigation | | | | | | | | | |

15.     Defendant Shapiro is a California attorney.  Rule 3.3 (*Candor Toward the Tribunal*) of the California Rules of Professional Conduct is one such rule.  Rule 4.1 (*Truthfulness in Statements to Others*) is another.  "*A lawyer is required to be truthful when dealing with others on a client's behalf.*"  <u>See</u> *Comment* to Rule 4.1.

16.     What followed was a series of foolhardy securities filings and corporate actions taken on the advice of Mintz Levin and Baker Botts leading to corporate suicide of MabVax.  To protect themselves – Hansen, Shapiro, Mintz Levin and Baker Botts – needed to create a further record to bolster the propriety of their actions in 2014-2015 and needed to present a viable defense of their own actions and advice given to Hansen and MabVax around the Telik transaction, the reverse merger and the securities filings

involving the investors, control of MabVax and contracts made, during *their* representation.  They did that and more – they looked for a scapegoat to accuse of wrongdoing, when all along it was their actions and advice that needed investigation.

17.     MabVax, without any knowledge, review or discussion with Plaintiff, secretly determined to repudiate four (4) prior years of its financial statements in its SEC filings – claiming the filings made during Plaintiff's tenure were somehow false having been motivated by Plaintiff to hide facts concerning the investors from the public.  They decided to assert that MabVax also could not file its required March 31, 2018 quarterly report which was not filed until October 15, 2018, six months late,  It decided to seek withdrawal from NASDAQ since the repudiation and non-filing decisions inevitably led to a NASDAQ notice of non-compliance rule violation.  MabVax determined not to submit a plan for compliance with NASDAQ rules and was summarily delisted.

18.     Plaintiff's firm formally withdrew from representation of MabVax on or about May 23, 2018 after learning of the unfiled quarterly report and repudiation of prior financial statements.  MabVax publicly blamed the missed filing on the inability to rely on internal calculations concerning outstanding shares and preferred stock conversions and tabulation of voting, adopting a theory that they might have improperly allowed investors to take control of the company which would require their ownership of preferred stock be counted collectively among all the investors, limiting the lawful conversion of preferred stock that they had routinely processed into common stock under the investment contracts, citing the SEC's investigation[1].

19.     MabVax's non-reliance and decision to miss a filing required to maintain compliant – actions that are required under its investor agreements – resulted in

---

[1] None of the other two companies involved in the SEC investigation took any similar steps and each continues to trade and file timely and accurate reports with the SEC.  Only MabVax took this unprecedented step.

resignation of their SEC auditor CohnReznick on August 3, 2018 and later was determined to have been wholly-unnecessary by the Delaware Chancery court[2].  These actions alone caused MabVax stock to be delisted from NASDAQ in July 2018, and its access to financing dry up.

20.    MabVax also, during this period, sought to avoid and did not disclose it was having serious problems with its human drug trials, the real reason for disguising its filings and not filing its March 31, 2018 quarterly report, as is now known.  The bad news was not revealed until 6 months following the due date for its filing when it finally filed in October 2018.  Until that time, it issued glowing press releases proclaiming the testing successes and that it did not have any adverse reactions  in its drug development.

21.     Investors have sued Defendant Hansen and MabVax's CFO Gregory Hanson for fraud in Florida state court.  Among other things, the complaint alleges that during that period Defendant David Hansen and CFO Gregory Hanson and other management members pumped up the price of the stock artificially in an illegal "pump and dump" campaign and sold millions of dollars of stock into the public markets.   See, *Honig et al., v. Hansen and Hanson*, No. 10598559, Circuit Court, 15th Judicial Circuit, Palm Beach Cty., Fla. (April 7, 2020). The lawsuit contends MabVax's CEO and CFO manipulated Plaintiff's stock price with false information and sold shares into public markets in a "pump and dump", raised money at artificially high prices (including from plaintiffs in that action) and hid bad press to pay outlandish salaries of over $5 million.

22.    The  complaint  further  alleges  that  earlier,  when  MabVax  selectively

---

[2] On September 20, 2018, the Delaware Chancery Court, *In re MabVax Therapeutics Holdings, Inc.,* C.A. No 2018-0549-TMR validated all prior corporate actions standing in stark contrast to MabVax' voluntary disavowal and reversal of four prior year's filings at the direction of Defendant Shapiro's legal advice showing the reckless self-destruction wrought by Defendants in their quest to hide the failures of drug trials from public scrutiny and from regulators.  In a press release, Defendant Hansen stated: "The Court's decision … is a critical first step in our progress toward filing our financial reports and becoming a current reporting company … and to reinstate our audited financial statements for the years ended December 31, 2017 and 2016.

shared confidential clinical trial test information with its senior lender as a condition to advancing the second tranche of a $10,000,000 loan, the investor refused to fund the investment.  The reason behind this refusal to invest $5,000,000 under contract was also not disclosed by MabVax.  At the time, MabVax's stock price on NASDAQ was over $4.20 per share. Plaintiff hid bad news from at least February 12, 2018 until October 2018 while raising money from investors that patient enrollments in its Phase 1 HuMab-5B Antibody trials were suspended due to an "adverse event".  "Despite the suspension of enrollment in their Phase 1 trails in February 2018, [MabVax] continued to paint a misleadingly rosy picture of the progress of the trials in press releases upon which … investors … would rely".  "[Hansen and Hanson] conspired to both publicly and privately inflate MabVax's share price so that they could sell into the artificially inflated market, harming shareholders … ".

23.     All the while, the New York office of the SEC was conducting its ongoing investigation.  In late January 2018, the SEC first notified MabVax (through Plaintiff as its New York counsel) that it was investigating certain of its registration statements as well as filings by selected investors. Shortly thereafter, the SEC issued a subpoena to MabVax for documents.  The investigation alleged, **_beginning in 2014_ (_nearly a year prior to Plaintiff's engagement as counsel and while Defendant Shapiro represented MabVax at his prior firm_)** certain investors had obtained enough stock to gain control of MabVax and through dealings with Defendant Hansen both MabVax and the investors may have failed to disclose this control in their respective SEC filings.

24.     While MabVax was under this pressure, the New York SEC also issued a subpoena to Defendant Hansen personally.  The SEC advised David Hansen (through Plaintiff at his New York office) that **_Hansen needed to obtain separate legal counsel_**

*from MabVax*.

25.    Defendant Hansen spent some time interviewing counsel and even shared a list of names approved by the company's insurer with Plaintiff.  Plaintiff recommended that MabVax seek out counsel that would be acceptable to MabVax's insurance carrier and advised the Board of Directors to secure counsel not previously associated with the company.   But then, unexpectedly, ***Defendant Hansen notified Plaintiff that Baker Botts' attorney Jonathan Shapiro had been engaged as MabVax counsel for an investigation,*** even though Baker Botts was not even an approved counsel on insurer's approved counsel list.  ***MabVax had engaged Hansen's personal attorney  as "litigation and SEC investigation counsel" ignoring the SEC's admonition to secure separate counsel.***   Plaintiff at first assisted MabVax's management and directors which were located throughout the country advising them on document preservation and related matters, and assisted them wherever they were located in preparing production for the SEC's document subpoena until resigning in late May 2018 and turning over those responsibilities at the direction of Hansen to Defendant Shapiro.

26.    On June 16, 2018, Defendant Locher of Baker Botts emailed Plaintiff from the Washington, D.C. office "… thank you for preparing this thumb drive.  If you could please overnight it *to my attention in our D.C office* at …. we would appreciate it, which was then overnighted from New York to D.C. by Fedex several days later.

27.    From that time in May until August 2018, Defendants Shapiro, Hansen, Neils, Locher and Baker Botts (and Mintz Levin) were hatching their scheme to find a scapegoat to accuse of wrongdoing and protect their firms and their practices.  They became aware through documents delivered by Plaintiff of the conflict waivers in which Plaintiff had identified several MabVax investors as also being his former clients,

including at prior firms where he had been employed.  Plaintiff, as is customary in such situations, and prior to engagement, informed in writing, requested and received written conflict waivers for various happenstance relationships he had with an investment bank that had represented investors in its March – April 2015 financing of MabVax as well as several investors in MabVax, a number of which were also known to be investigated by the SEC not for their activities at MabVax, but for their trading activities and their SEC reporting involving three companies, only one of which being MabVax.

28.     On multiple occasions from 2015 to 2018 MabVax had been updated and kept fully apprised and provided written waivers of these potential conflicts and provided consent.   Additionally, MabVax was fully apprised to the fact of Plaintiff's own investment in MabVax in the March-April 2015 offering.  Plaintiff had made a personal investment prior to being engaged as counsel, and later received additional shares for his firm through conversion of legal fees.

29.     Mintz Levin, at the time when Defendant Shapiro was a current partner of such firm, even had ample opportunity to assess and review the conflicts and ownership by Plaintiff, as well as the engagement letters and written waivers.  Mintz Levin raised no objection nor sought further details, and MabVax was encouraged to review the conflicts and ownership arrangements with Mintz Levin, its counsel at the time.  Each of the conflict letters principally arose out of an abundance of caution, since certain of MabVax's investors served as founders, officers and directors of other public and private company clients of Plaintiff, and also as personal clients on several unrelated matters.

> You specifically acknowledge that we have informed you that we have represented **Axiom Capital Management, Inc.**, as placement agent, in connection with a recent financing transaction in which **Barry Honig, John Stetson and Mark Groussman**, and certain of their associated companies or investment entities, are investors, who are also our client, and may represent others who are investors in the Company in which the Company has been

represented by **Mintz, Levin, Cohn, Ferris, Glovsky, and Popel, P.C.** and that the Company waives any and all conflicts with respect thereto, including any appearance of conflict, that could exist or arise as a result of such representation or ownership (subject to the above prohibition of representation of parties wherein an [sic] any interest that may be directly adverse to you exist).

**Ownership of Shares: Potential Conflict of Interest Disclosure**.

(iii) As a result of our ownership or the investment made by any of our personnel in securities of the Company…we are required to inform you of the potential for a conflict of interest that may arise by virtue of our financial, business or personal interests that may result from our ownership of shares and our right to receive further payments in shares, **and our and certain of our attorney's ongoing interest as a shareholder of the company** [emphasis added] or its successors, which interests may be different from the interests typically present in an attorney-client relationship. Accordingly we are required to advise you that we are not representing you as counsel in connection with your determination to accept our proposal for services to be paid in securities or for any investment made by any of our personnel, and of ***your right to seek (and our explicit encouragement that you seek) independent counsel with respect to our fee arrangement and the matters herein, and that the execution of the agreement to which this Addendum is attached constitutes your written consent to such arrangement.***

*See*, April 2015 Engagement letter.

      30.    Defendant's hatched their scheme using a patchwork cast from the allegations made by the SEC and around relationships with the investors whom MabVax had waived conflicts, in order to tie Plaintiff to the investors as yet another culpable wrongdoer –Defendants threatened and cast Plaintiff not as a counsel but accused him as a *member* of the group to be charged by the SEC – potentially the ringleader- believing their pressure properly applied could sway the government, and Plaintiff would be added to the persons being pursued and prosecuted by the government, named in an SEC lawsuit and prosecuted by the DOJ.  However, none of this materialized.  Plaintiff was never being investigated by the SEC, no Wells Notice was issued to Plaintiff or his firm, no formal order of investigation or inquiry directed at Plaintiff was issued, and Plaintiff was never directly subpoenaed in the SEC's investigation of the investors.  Plaintiff was

never subpoenaed, called to testify or give a statement, or contacted concerning the SEC's claims. He never served as a witness in any manner whatsoever against MabVax or any of the investors. Each of the investors has settled with the SEC, without admitting or denying any of the allegations. MabVax has not been accused of making any false filings that MabVax or its executives failed to disclose its true control by any investors.

31.     In their misdirection of the government away from Hansen and Mintz Levin/Shapiro in its investigation they succeeded in establishing there were no improper filings made in 2014-15 concerning ownerhip, control, groups or "blockers". But that didn't stop Defendants from making the threatening allegations against Plaintiff. Neither MabVax, nor Defendant Hanson, nor Mintz Levin has ever been sued or charged by the SEC on any MabVax matter. Defendant's scheme was, in essence, making it look like Plaintiff was the ringleader and handing him over to the authorities – pay up or else. They threatened to and took steps in furtherance of this plot – to no avail because none of it was true. But as a threat it was illegal.

32.     There being not a scintilla of evidence and a total lack of any factual support did not dissuade Defendants from falsely threatening Plaintiff to disclose that he was part of an illegal scheme, a group pump and dump which he participated in or led. In fact, it was Defendant Hansen and other management that was engaged in their own deception as shown in the recent lawsuits against them, selling stock on artificially rosy reports of their drug development progress at the expense of unwitting investors even seeking, and obtaining, over $1 million from the very investors under investigation in late 2018 after Plaintiff's resignation but before revealing the truth about the adverse drug effect that required patient enrollment be suspended.

33.     Defendants developed a plan to threaten Plaintiff and his former law firm,

preparing a complaint that outlines a parade of horrible innuendo and half-truths so damming that the mere repetition of such claims in court would threaten the very ability of Plaintiff to ever practice securities law or secure the confidences of clients again, as was intended.   To threaten Plaintiff with the prospect of a hugely embarrassing lawsuit citing liberally from internal confidential emails and communications delivered to Defendants exclusively for use in connection with the SEC subpoena and no other purpose they threatened they would reveal MabVax attorney-client protected advice and privileged emails and their theories that MabVax's woes were the result of Plaintiff's favors to the investors motivated by the waived conflicts, that Mintz had reviewed but were being conveniently ignored.   But by threatening all the while Defendants were actively protecting themselves and their deeply conflicted relationship with Hansen, and not representing the client (MabVax) they were charged with representing in an investigation of Hansen.

34.   Defendants Baker Botts and Shapiro stunned Plaintiff when it delivered the draft complaint threatening it for an action to be brought by MabVax for fraud, breaches of duty, defalcations and other misfeasance cast from confidential and privileged emails and other materials designed to embarrass and intimidate – all the while working to convince the SEC that no such fraud, breaches of duty, defalcations or other malfeasance existed..   The emails quoted from were internal deliberations and "chatter" common among attorneys debating legal positions and exchanging ideas – sometimes in crass and unprofessional terms as is done among attorneys – but protected by longstanding privileges against disclosure in court cases.   These materials were only in Defendants Shapiro, Neils, Locher and Hansen's possession because of a subpoena and Defendant Shapiro's *explicit* promise they were receiving documents as MabVax's

"*investigation*" counsel under the SEC subpoena, expecting they be afforded attorney review to protect the documents from inadvertent disclosure. Instead, Defendants quoted falsely, misrepresented meaning and took out of context a multitude of colorful quotes to make their illegal demand. Shapiro had previously represented the purpose was to protect MabVax by reviewing the materials under the control of Plaintiff's firm as its counsel as per his email and letter written to Plaintiff, but at no time did he intend to follow his own representation made to his predecessor and co-counsel:

> "As discussed, ***Company counsel with respect to the pending SEC investigation is our office, Baker Botts L.L.P.,*** and with respect to corporate and transactional matters is ***Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C***.

*See* May 29, 2018 letter from Jonathan Shapiro to Plaintiff.

35.     All the while Defendants were surreptitiously developing their thoroughly dishonest strategy anchored on their lies to Plaintiff, they were in fact assisting Defendant Hansen to maintain singular and complete control over MabVax. They forced into resignation each independent member of the board of directors elected by shareholders, and even the special committee resigned. Defendants' attorneys' conflicts of interest are deep, obvious and fundamental – a company that establishes a special committee to investigate illegality by its CEO and charges by the SEC must be independent, cannot be the very firm that rendered the advice and must not also be the CEO under investigation's own counsel – doing so violates fundamental notions of independence and fairness, state law, and violates the counsel's duties to its client's (MabVax') shareholders and investors as well as other stakeholders. Common sense dictates independence and lack of conflicts are fundamental to a fair and impartial process. See *The Harvard Law School Forum on Corporate Governance report on Internal Investigations Special Committees Resource*, July 6, 2017. Defendants actions show no regard for these basic rules. Such conflicts are

un-waivable and a breach of the attorney Defendant's ethical duties[3].  Defendant Shapiro and Niels hold themselves out as experts on internal investigations and special committee practices on their websites and in articles yet violated the basic premises of these rules through their illicit actions.

36.     Defendants chose to use the documents and threaten Plaintiff, while violating numerous canons of ethics applicable to attorney dealings and acted dishonestly with respect to the information provided by Plaintiff.  Defendants misused subpoenaed documents to prepare a defense for Defendant Hansen to insulate him alone from SEC action, and not to assist its actual client MabVax.  Defendant Shapiro even went so far as to dismiss Plaintiff's repeated admonitions - to preserve and protect privilege over MabVax and Plaintiff's documents sent to Defendants.   Shapiro responded curtly disregarding the rules "We do not, however, understand your comments regarding the attorney-client privilege … the privilege belongs to the client, not counsel, so we cannot agree to anything".  It is not clear who he thought his client was – Hansen, MabVax, or Mintz Levin, when delivering a trove of documents to the SEC, including privileged and confidential MabVax communications and internal firm emails.  See May 24, 2018 email Jonathan Shapiro to Plaintiff.

37.     Defendants real intentions were finally revealed with a multimillion dollar lawsuit threat, claims about Plaintiff's malpractice, threats to turn over Plaintiff to the SEC and DOJ and threats to reveal embarrassing disclosures that would ruin Plaintiff's career.  Defendant Baker Botts threatened Plaintiff and sent to Plaintiff and his partners at their New York office on August 17, 2018 the letter enclosing and referencing the draft complaint within quoting extensively from numerous confidential, privileged and internal

---

[3] Plaintiff has provided information and filed an ethics complaint with the State Bar of California against Jonathan Shapiro.

documents.  The Complaint, however, *was never filed,* which belies the true motivation for the letter and true intention - extortion.

38.     Given the dual and conflicting representation of Defendant Hansen, the culpable behavior at Mintz Levin by Defendant Shapiro, and the ethical lapses by Baker Botts and the attorney Defendants, the Complaint would not fall within any exception for attorney dealings in anticipation of genuine litigation under New York law, and was never filed a precondition to settlement of genuine litigation efforts.  The complaint was intended to force a payment so that Hansen could stay at the helm, so MabVax could obtain funds to continue to pay his exorbitant salary and maintain his lifestyle garnered, in part, from the illegal stock sales he is accused of, and his personal counsel Shapiro's continuation in earning his multi-million dollar fees.  Over a million dollars was billed for just four months' work (May to August 2018) on the so-called "investigation" by Baker Botts, according to MabVax's creditor statements in MabVax's Chapter 11.  A large amount of these bills are likely attributable to the personal representation of David Hansen, defending him from the SEC investigation and producing the unfiled complaint against Plaintiff and his firm, and not for MabVax itself.

39.     On August 17, 2018 Defendants emailed and delivered via Federal Express to New York their letter enclosing and referencing their 28-page never-filed lawsuit.  Defendants Shapiro and Baker Botts' New York attorney Lynn Neils, on information and belief, prepared the complaint.  Defendants threatened to file *in three (3) days' time* if Plaintiff (and his firm) did not pay up.

40.     The Defendants actions were part of an intentional scheme to defraud Plaintiff out of money and property. The unfounded allegations however, fit into a larger context.  During Defendants representation of MabVax on the SEC subpoena Defendants

realized Plaintiff was periodically mentioned in a long simmering feud with several MabVax investors involving another company Biozone/CoCrystal Pharma ("Biozone"). The disgruntled founder and two of his attorneys assisted him coining a term "Frost Gang" and liberally derided Plaintiff while including Plaintiff as a member of the "gang" for his work as counsel to Biozone during the disputed period, and for representing various investors and management members as counsel in litigation.   The campaign involved  bringing numerous civil lawsuits, encouragement and cajoling for the DOJ and SEC to investigate and bring charges, and the founder's own whistleblower complaint, letter writing and false press.  They called this a maximum pressure campaign to force billionaire and pharmaceutical giant founder Dr. Philip Frost (Teva Pharmaceuticals, Inc.) also an investor in MabVax, and others,  to pay them extortion in order to terminate these activities.

41.      Defendant Baker Botts also knew, from its representation of the law firm Haynes and Boone, LLP in 2010 for breach of a partnership agreement, the firm had defended against Plaintiff's claims with the same unsupported allegations of ties to certain MabVax shareholders who were then clients of that firm.   Armed with this knowledge, harboring high animosity over the resolution of that case, and having the BioZone campaign in their mind, Defendants seized upon a chance opportunity to get even by threatening and extorting Plaintiff elevating the ongoing drama and joining the party.  They would and did adopt the same tactics being employed in BioZone's extortion campaign and expanding upon it.   They gave breath to Biozone's protagonists by threatening Plaintiff's association with threats to file suit, disparage, defame, implicate, report and whistleblower to DOJ and SEC.  They communicated this through the draft complaint that constitutes and is part and parcel of the letters and meetings in New York

threatening suit. They demanded information about the limits of Plaintiff's firm's insurance policies.  They took affirmative steps to show they were serious by threatening to cause MabVax to authorize privilege waivers – ***selectively*** – and turning over to the SEC and DOJ MabVax's attorney client privileged  communications ***but only those with Plaintiff[4].***  They disregarded the damage to any defense this would cost their own client MabVax against any forthcoming SEC charges pending.   All this,  in order to protect David Hansen from charges that could be brought by the SEC against him personally and to secure an immediate payment of $9.6 million.

42.      Defendants however, had no intention of filing anything.  How could their conflict of interests allow it and their attorneys (Shapiro) would be the key witness in an action given his senior position at Mintz Levin advising MabVax on "group" and "beneficial ownership" reporting in 2014-2015, the very period of SEC inquiry? The filing would surely highlight Shapiro's nefarious roles and the numerous conflicts of interest, and implicate Mintz Levin and their other client Hansen.  Violations of the Rules of Professional Responsibility in California where the unfiled complaint was captioned to be filed are abundant.  It would lead to one client – MabVax – asserting claims against its other client – Hansen.  Rather, the sole purpose of the draft was to associate Plaintiff with certain "Investors" who, at the time, were being investigated criminally by the Department of Justice and by the Securities and Exchange Commission. Baker Botts and Shapiro used the artifice of a "lawsuit" to threaten Plaintiff that if they did not pay $9,600,000, Defendants would use their contacts, power, influence and political

---

[4] No such waiver of Mintz Levin privileged communications ensued for production to the SEC of Mintz Levin legal advice or work product would be made even though from 2013-2015 MabVax was exclusively represented in the transactions alleged underlying the SEC claims, and prior to Plaintiff's hiring by MabVax in April 2015. Defendant Shapiro was a partner at Mintz Levin from 2013-2016 which likely explains the desire to hide the advice given by Mintz Levin on the SEC's charges against the investors, while seeking to blame Plaintiff.

connections to implicate Plaintiff in criminal wrongdoing and cause DOJ and SEC to pursue Plaintiff.

43.     Finally, on July 31, 2018, unable to withstand pressures bearing upon even them, the entire Special Committee of the Board of Directors, and each independent member of the Board of Directors unaffiliated with Hansen, resigned freeing Defendants Hansen, Shapiro and Baker Botts to execute their plan unfettered by independent investigation trampling on the rights and interests of MabVax, its investors and other stakeholders[5].   This significant event was required to be reported to the SEC within four (4) business days but was hidden for over two (2) months until reported in the late Quarterly Report filed by MabVax.

> *Effective July 31, 2018, Paul Maier, Jeffrey E. Eisenberg, Thomas C. Varvaro and Kenneth Cohen, resigned as members of the Company's Board of Directors.*
>
> *Following the resignations, in a separate action, the Board of Directors appointed our Chief Financial Officer, Gregory Hanson, as a member of the Board. Mr. Hanson has served as our Chief Financial Officer since July 2014, and of its subsidiary, MabVax Therapeutics, Inc. since February 2014.*

*See* Quarterly Report on Form 10Q for the period ended March 31, 2018 filed with the SEC October 15, 2018.

44.     The draft lawsuit, *inter alia*, contained the following misrepresentations that were made for the sole purpose of making threats to implicate Plaintiff in illegality and repeatedly references the ongoing SEC investigation to drive home the threat.   The complaint is clear on this point.   It repeatedly asserts Plaintiff acted illegally and that the

---

[5] References to various documents and matters have been intentionally omitted from this Complaint since. MabVax sought and obtained a protective order in a pending federal court action in California preventing disclosure herein of incriminating documents and admissions that have been produced by MabVax during discovery in that case. Plaintiff has been threatened with sanctions for providing information to the United States Trustee and for reporting Defendant Shapiro to the California bar.  The scope of the confidentiality sought by MabVax limits Plaintiff's ability to quote from or produce documents in this case and is being disputed in pending discovery motions.   Accordingly, information provided herein is based upon the firsthand personal knowledge of Plaintiff from his dealings with Defendants.  Specific use or references to documents, board proceedings, Mintz Levin advice and Baker Botts involvement is "upon information and belief" in most cases, and reliance on the documents is disclaimed, pending rulings on any such motions.

consequences of Plaintiff's actions were the subject of the SEC investigation into the very

group conduct by the Investors that Plaintiff was a part of, even accusing Plaintiff of a

"pattern of deception" in response to the SEC investigation - extorting a settlement – a

settlement that Defendants knew neither they nor their client MabVax was entitled to

receive:

> "2.   … Rather than looking out for MabVax, the lawyers [Plaintiff] exploited their positions of trust by looking out for themselves, and for other more-valued clients who had illicit interests directly adverse to MabVax";

> "3.   … Sichenzia/Kesner failed … to advise and disclose that a number of its largest investors … were acting in a manner such that federal regulators would consider the Investors to be an unlawful 'control group' for purposes of the United States securities laws … Sichenzia/Kesner *themselves* are part of the Investors";

> "5.   … Sichenzia/Kesner provided MabVax with the misleading legal advice in order to protect the illicit interests of themselves and their other clients, the other Investors";

> "8.   … Sichenzia/Kesner … were hopelessly conflicted given: (1) their undisclosed involvement in the matters under investigation, (2) their representation of multiple other Investors also known to be under government scrutiny, and (3) their status as an investor and a member of the same group of Investors under investigation";

> "9.   … At this point MabVax cannot even determine whether its now-former counsel traded in possession of the material non-public information entrusted to them by their own public company client";

> "27.   … [I]t is clear that Sichenzia/Kesner profited handsomely from its relationship with MabVax (in excess of $1,600,000), although to this day MabVax cannot determine how much more Sichenzia/Kesner profited … because the lawyers refuse to come clean";

> "29.   … Investors (including Sichenzia/Kesner) have acted in such a way that, on information and belief, Sichenzia/Kesner knew … that the Company faced legal exposure because the Investors should be treated as a 'group' under the securities laws;

> "41.  On information and belief, it was MabVax's own counsel at Sichenzia who gave Honig the 'head's up' that the Consent Right had terminated";

"44. … In light of fact[s] that have come to light, it is now apparent that Schenzia/Kesner knew or should have known that they were exposing the Company to claims that its response [to regulators] was misleading or, at least, difficult to defend. In so doing, Sichenzia/Kesner once again jeopardized MabVax in order to protect themselves and fellow Investors from regulatory scrutiny as being part of an undisclosed control group";

"47. … [N]ow that the frailty of the of the Sichenzia/Kesner 'blocker' firewall has been revealed, MabVax no longer has confidence that the 2,628,766 shares of common stock issued to Investors via preferred share conversions are valid and also cannot be certain its previous reports regarding the number of common shares outstanding are accurate";

"54. … Kesner repeatedly made false and misleading statements to successor counsel [Baker Botts], for example, lying about Sichenzia/Kesner's role in the underlying conduct …; mischaracterizing the circumstances of his engagement by MabVax …; inaccurately characterizing MabVax's legal defenses, including the very 'blocker' firewall theories that created the exposure in the first instance; and refusing to disclose his outside trading activity in MabVax stock."

45.     There was no mistaking the magnitude of the threats lodged against Plaintiff by Defendants. Defendants were never interested in mediation.  As was repeated to Plaintiff after August 17, 2018, if they did not pay the unjustified sum demanded ($9,600,000), they would be handed over to DOJ and the SEC, viewed as guilty by the Government, and Defendants would do everything necessary to cause the Government to expand its investigations, to bring charges against Plaintiff, and to destroy his professional reputation.  As a direct and proximate result of Defendant's extortionate demands, Plaintiff lost his valuable partnership and employment with his firm where he served as a respected member on the Executive Committee.  The reverberations have been felt for years with Baker Botts handing over to another firm the charge of bringing a lawsuit.  It is unknown what fee-sharing and cooperation agreements exist between Defendant's and the other firm.  The effect has reverberated widely, with media and clients, and Plaintiff losing the opportunity to serve as "counsel" at his former firm following their concern over publicity.  For over two years, Plaintiff also suffered

extreme emotional and physical distress under the repeated threat that Baker Botts would use its power, Washington connections, and position of trust as to "turn in" Plaintiff to the DOJ and SEC and promote their manufactured false account while suborning perjury by Defendant Hansen and his puppet CFO Gregory Hanson to support a prosecution of Plaintiff by the Government.

46.     In furtherance of the scheme to extort Plaintiff, Defendants manufactured evidence and made false filings with the SEC, NASDAQ and others to support their threats that Plaintiff himself was part of an undisclosed beneficial ownership "group" that controlled MabVax – a claim with no factual support whatsoever. Defendants also caused MabVax to make false filings with the SEC to bolster their account and press for government action. They authored, encouraged or caused MabVax to file untrue reports with the SEC and the Bankruptcy Court to promote the false and extortionate narrative to the DOJ and SEC that Plaintiff was part of a criminal enterprise group while they pressed for their illegal extortion payment, knowing the government was watching and reviewing every filing made adding Defendant Hanson's grandiose false sworn statements and Sarbanes-Oxley certifications both in the bankruptcy filings and SEC reports.

47.     No litigation was ever filed by Defendants with the draft complaint they used to threaten and extort.

## I.   PARTIES

48.     Plaintiff is a citizen of Florida. Throughout the time he was extorted by Defendants, Kesner lived with his family in Fort Lauderdale. Kesner is 62 years-old. He graduated from the State University of New York (Binghamton) in 1979 with a Bachelor of Science in management. He obtained his Juris Doctorate from American University, Washington College of Law, in 1982, and a Masters' Degree in Business Administration-

Finance from American University in Washington, D.C. in 1984. Kesner has served as a director and officer of many corporations. He is a member of the Bar of the State of New York and is licensed to practice before all State and Federal Courts in New York. Kesner began his long career as an attorney/examiner for the SEC. Kesner reviewed registrations, filings and reports under the federal securities laws, public offerings, mergers, proxy solicitations and contests primarily in high technology, manufacturing and insurance industries. He prepared agency responses to no-action letters and interpretive requests on securities law regulatory issues. He also participated in enforcement referrals and investigations for violations of regulatory, compliance and reporting obligations. Between 1982 and 2018, Kesner built an  extremely successful practice as an attorney representing clients in securities matters. Kesner was a partner in the New York law firm, which consistently ranked as one of the top law firms in the nation for issuer, investor and private placement-agent legal counsel. Kesner's practice focused on finance, mergers and acquisitions, and public company representation. He has extensive experience in financing and counseling late- stage private companies transitioning to public company status through initial public offerings and alternative public offerings. Kesner's expertise includes counseling already public companies in SEC filings, compliance (including Sarbanes Oxley) and regulatory reporting, registered public offerings, private offerings, PIPEs, venture capital, leveraged buy-outs, restructurings, workouts, and day-to-day operational and regulatory issues. He served as an Arbitrator for the New York Stock Exchange ("NYSE") and the Financial Industry Regulatory Authority ("FINRA") in numerous securities and employee disputes. He was a frequent speaker on legal developments and evolving financial products and markets and routinely provided the SEC, FINRA, Depository Trust Company (DTC) and others' comments and advice on

proposed securities rulemaking and regulations.  Plaintiff enjoyed an untarnished personal and professional reputation in the community in which he lived and worked, with clients, with professionals at his firm, with colleagues in the law and the securities industry, and with his many friends. His clients were drawn from a broad network of relationships developed over 30 years with professional and social contacts including investment bankers, private investors, officers, directors, lawyers, auditors and accountants who garnered high respect for his skills, judgment, contacts and acumen. For eight (8) years, Plaintiff earned the prestigious New York "Super Lawyers" designation based upon peer review recommendations, an honor earned by no more than 5% of New York attorneys, and SRFK was rated one of New York City's best corporate law firms by Best Lawyers' magazine.

49.     Defendant, Baker Botts, is a global law firm with offices, partners, associates, agents and employees in New York City and the world, including New York City. [https://www.bakerbotts.com/offices/new-york]. At all times relevant to this action, Baker Botts was ready, willing, able and primed to make good on its threats to Kesner and SRFK. Baker Botts' "Enforcement and Investigations" team included seasoned lawyers throughout the world, many of whom held prior federal and state government service positions, including nationally recognized trial lawyers, a former U.S. Attorney, a former Assistant Attorney General for the Justice Department's Antitrust Division, a former Deputy director of the FTC's Bureau of Competition, the former Chief of Enforcement for the Financial Industry Regulatory Authority (FINRA), former Assistant U.S. Attorneys, state prosecutors, SEC Enforcement lawyers, and DOJ Environmental Enforcement lawyers. A Baker Botts attorney served as general counsel to the SEC and seven (7) others are SEC alumni. Baker Botts Capital Markets and Securities Team is regaled on the firm's website for, among other things, its expertise in securities offerings,        including        private        placements        and        convertible        securities.

[https://www.bakerbotts.com/services/practice-areas/corporate/capital-markets-and-securities-offerings].

50.     Defendant Shapiro, is Department Chair – Litigation and partner of Baker Botts in the San Francisco, California office.  His practice focusses on litigation including Securities and Shareholder Litigation.   [https://www.bakerbotts.com/people/s/shapiro-jonathan-a].  Defendant Shapiro was a partner in the San Francisco office of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. from April 29, 2013 through his hiring at Baker Botts, L.L.P. May 16, 2016.

51.     Defendant Neils, is partner in the New York office of Baker Botts.  Her practice focusses on white collar defense and corporate investigations. [https://www.bakerbotts.com/people/n/neils-lynn-a]

52.     Defendant Locher, was at all relevant times an associate in the Washington, D.C. office of Baker Botts.

53.     Defendant Hansen, is the President, Chairman of the Board, chief Executive Officer, and  one of the founders of MabVax Therapeutics Holdings, Inc. and its predecessors.

## II.     JURISDICTION AND VENUE

54.     The United States District Court for the Southern District of New York has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (Federal Question), 28 U.S.C. § 1332 (Diversity Jurisdiction) and 28 U.S.C. § 1367 (Supplemental Jurisdiction). The parties are citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest, costs and fees.

55.     The Defendants are subject to specific personal jurisdiction in New York.

56.     They were physically present in New York. They emailed and otherwise

transmitted documents to New York in furtherance of the extortion scheme. They committed  multiple intentional torts, in whole or part, in New York, causing injury to Plaintiff in New York. Their conduct was purposefully directed at New York and was continuous and systematic. The Defendants have minimum contacts with New York such that the exercise of personal jurisdiction over them comports with traditional notions of fair play and substantial justice and is consistent with the Due Process clause of the United States Constitution.

57.   Plaintiff is an attorney admitted only in the State of New York with a law practice located in New York City for the past 30 years, and was harmed in New York.

58.   Venue is proper in the United States District Court for the Southern District of New York pursuant to Title 18 U.S.C. § 1965(a) and Title 28 U.S.C. § 1391(b)(2). The Defendants reside, are found, have agents, and transact affairs in New York. A substantial part of the events giving rise to the claims stated in this action occurred in the Southern District of New York, where Plaintiff suffered actual damages and special damages.

### III.   STATEMENT OF MATERIAL FACTS

59.   On January 26, 2018, the SEC opened a formal order of investigation into MabVax Therapeutics Holdings, Inc. ("MabVax"). Pursuant to the order, the SEC issued a broad subpoena for production of documents. The formal order and the subpoena focused on the CEO and CFO of MabVax (not on Plaintiff or his firm), SEC filings and Sarbanes-Oxley certifications they signed, and potential failures by investors to report their beneficial ownership accurately, alleging violations of federal securities laws by the CEO and CFO and reporting violations by third parties. The SEC's subpoena made no mention of Plaintiff.

60.   The investors at issue in the SEC investigation became involved in MabVax

starting around 2013-2014. The formal order of investigation represents that the Commission had information that tends to show that *from at least June 1, 2014* MabVax committed various violations of federal securities laws. Plaintiff was not engaged by MabVax until notified on April 16, 2015 when he received a returned executed engagement letter containing confirmation of waiver of various conflicts of interest, facts well known to Defendants.

61.   On September 7, 2018, the SEC filed a Complaint in the Southern District of New York (the "SEC Complaint")[6] against several investors arising out of their investments in MabVax.  The crux of the Complaint describes conduct of the investors from *February 2014 through early April 2015*, all prior to Plaintiff's engagement by MabVax.  The Complaint describes the *July 2014* Telik merger and financing, a $3 million investment in MabVax made *in February 2014*, and a "Consent Right" MabVax granted to an investor *in February 2014* by which MabVax had to obtain consent from an investor to engage in certain corporate actions.  The SEC Complaint describes additional investments in MabVax made *in March and April that closed April 6, 2015*. Importantly, the SEC contends the investors failed to file reports with the SEC in July 2014 and April 2015 disclosing they were acting as a group in connection with their investments, does not name MabVax **and does not name Plaintiff**.

62.   On March 21, 2019, David Hansen filed a sworn declaration in support of Plaintiff's Chapter 11 Petition  (the "Declaration"). Hansen describes the same merger and financings, and consent right addressed in the SEC Complaint that occurred in 2014 to April 2015 **before MabVax engaged Plaintiff April 16, 2015**.

63.   On May 4, 2019, MabVax sued 30 of its investors and service providers in

---

[6] The SEC amended the complaint twice but did not expand its claims to add Plaintiff's SEC reporting to the counts.

the Superior Court of California for the County of San Diego.  "In 2014 … [MabVax']
promising future was cast into peril, after a group of market manipulators … accumulated
a controlling position … pretended they sought legitimate returns … but instead
defrauded the Company. …" MabVax's Complaint continues by alleging misconduct of
its investors during the time period before MabVax engaged Plaintiff.  ***Defendant was
not engaged until April 16, 2015***.

64.    Neither Plaintiff nor his firm played a role in developing disclosures in 2014
alleged by the SEC to be false when made in 2014.   Instead Mintz Levin/Jonathan
Shapiro represented MabVax at that time – when Defendant Shapiro was a senior partner.
Mintz Levin would have been responsible for drafting SEC reporting and developed all
protocols for disclosure and the forms for investments in convertible preferred stock and
warrants. The form, terms and conditions for investment were produced by prior counsel,
not Plaintiff, and counsel to the investors. In 2014, these prior counsel opined upon and
rendered advice to MabVax about effectiveness of beneficial ownership "blockers", the
effect thereof, whether the securities required the investors to be treated as a "control
group" and how SEC filings and reports would be made. All of the 2014 investment
agreements were prepared by and handled by experienced international law firms Cooley,
LLP, Schulte, Roth & Zabel, and Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
Mintz Levin even continued as MabVax counsel and as "conflicts counsel" following
Plaintiff's April 2015 engagement to the present. Unlike Plaintiff, none of these firms
were threatened by Defendants despite ample basis.

65.    Baker Botts routinely provides its own clients advice regarding matters
involving SEC reporting and control group matters and has suitable expertise in the field
to know that MabVax reporting was at all times accurate and correct.  For example, its

client Cactus, Inc., in filings prepared by Baker Botts, reported that "[t]he amounts and percentages of common stock beneficially owned are reported on the basis of regulations of the SEC governing the determination of beneficial ownership of securities. Under the rules of the SEC, a person is deemed to be a "beneficial owner" of a security if that person has or shares voting power, which includes the power to vote or direct the voting of such security, or investment power, which includes the power to dispose of or to direct the disposition of such security. Securities that can be so acquired are deemed to be outstanding for purposes of computing such person's ownership percentage, but not for purposes of computing any other person's percentage. Under these rules, more than one person may be deemed a beneficial owner of the same securities, and a person may be deemed to be a beneficial owner of securities as to which such person has no economic interest."

66.    Baker Botts advised on the very same rules and regulations at issue in the SEC investigation of MabVax's management and the investors. Its client, KBR, Inc., reported holdings by investors such as The Vanguard Group, Inc. and BlackRock, Inc. as follows: "The percent of class beneficially owned is calculated based on 142,081,375 shares of our Common Stock issued and outstanding as of April 2, 2019. In addition, if a person has  the right to acquire beneficial ownership of shares within 60 days … those shares are deemed beneficially owned by that person as of that date and are deemed to be outstanding solely for the purpose of determining the percentage of Common Stock owned. Those shares are not included in the computations for any other person".

67.    Plaintiff initially represented MabVax in connection with the SEC subpoena for documents. They carefully guarded all privileged material.

68.    In May 2018, Baker Botts and Shapiro, Neils and Locher were engaged to

represent MabVax in the SEC's investigation of MabVax. They knew the reporting rules of the SEC. They knew these rules exclude securities that cannot be voted or disposed of by another investor and which cannot be acquired within 60 days, as they advised their own clients on the same matters. Despite this precise knowledge, Baker Botts and Shapiro, Neils and Locher decided to falsely accuse Plaintiff and misrepresent that he (not Mintz, Shulte or Cooley) had provided MabVax with contrary legal advice. Baker Botts and Shapiro, Neils and Locher also took contrary positions when they advised and filed SEC reports that disregarded these well-established principles as a "set-up" to extort Plaintiff.

69.     After Plaintiff resigned from representing MabVax, MabVax held meetings with the SEC, and provided documents and testimony to the SEC, while Baker Botts and Shapiro continued to demand settlement payment as part of their extortion.

70.     Since 2011, reports, online news and blogging had been promoting a storyline that certain investors in MabVax were being investigated by the DOJ and SEC for their roles in alleged "pump and dump" schemes involving a multitude of other companies. Baker Botts and Shapiro, Neils, Locher and Hansen learned of these other stories and used it to support their extortion scheme. Several articles associated Plaintiff with these investors since Plaintiff was known to have served as legal counsel to a number of the companies named in the articles – some investors and some issuers – having been referred by his social and professional networks over the course of more than fifteen (15) years. In addition to the online blogs and articles, speculation about SEC investigations of the investors was fueled by a letter writing, media and harassment campaign undertaken in connection with litigation involving several of the investors, including famed Miami investor, philanthropist and billionaire Phillip Frost ("Frost"). So-

called "whistleblowers" sent repeated communications to public officials, board members, officers, stockholders and others about their claims in an effort to force a large settlement from Frost and the other BioZone investors by Dan Fisher, the founder, and his cooperators. After several years these whistleblowers sued each other unhappy with their share of the "take" from the campaign[7]. They revealed their exertion of a maximum pressure campaign using civil litigation, press coverage and law enforcement to exact a large settlement form Dr. Frost and other wealthy people often including Plaintiff in their narratives. Rather than relying on the courts, they published and mailed false and unsupported allegations for a goal denied them in court. Ultimately, Dan Fisher delivered to Plaintiff a sworn statement admitting no complicity by Plaintiff in any matter and discrediting the blogger as providing inaccurate reporting on his interview with her. Baker Botts however chose to rely on the unsubstantiated blogs, short seller stock promotions of false theories and a jailed blogger, failing completely to meet the minimal standards applicable to lawyers filing suit to conduct investigation into the veracity of the information in the threatening complaint. Baker Botts and Shapiro, Neils and Locher made no reasonable investigation to establish the truth before presenting its draft extortion complaint threating to bring MabVax allegations against Plaintiff to the SEC and DOJ further lumping Plaintiff with Frost and the others to allege a control group in their own extortion ploy.

71.    Baker Botts and Shapiro, Neils, Locher and Hansen knew about the associations between Plaintiff and Frost and others that were being made in these online

---

[7]   Daniel Fisher and his lawyer, Lee Pederson, coined a phrase, "Frost gang", which the media picked up on. [https://www.miaminewtimes.com/news/miami-billionaire-phillip-frost-sued-for-additonal-stock-fraud-10971262]. Fisher and Pedersen lumped Kesner with Frost and others in complaints and letters. See, e.g., Lee Pederson v. Philip Frost, CoCrystal Pharma, Inc., and Daniel Fisher, Case 0:19-cv-01777-JNE-DTS (D. Minn. 2019). In Pederson, it was stipulated that the SEC Office of the Whistleblower rejected the allegations and refused to proceed against any party based upon the pressure campaign, upon which Pederson turned to harassing the SEC staff.

blogs and articles. By reason of their representation of MabVax in the SEC investigation, Baker Botts and Shapiro, Neils, Locher and Hansen also knew that the SEC was going to bring a massive civil enforcement action against Frost and other investors. Armed with this knowledge, they concocted a story about Plaintiff being complicit in the alleged "illicit" activities of Frost and others. With knowledge that the SEC was going to move against Frost and other investors, they saw the opportunity to extort a settlement from Plaintiff and his firm.

72.     On September 7, 2018, after a thorough, multi-year investigation, the SEC filed a civil enforcement action against Frost and other investors in the United States District Court for the Southern District of New York (the "SEC Action") for activities spanning a period of five (5) years from 2013 to 2018. The SEC's complaint alleged as follows:

> 1.     This case involves three highly profitable "pump-and-dump" schemes perpetrated by Honig, Stetson, Brauser, O'Rourke, Groussman, and Frost, and their entities GRQ, SCI, Grander, HSCI, Melechdavid, ATG, Opko, FGIT, and Southern Biotech from 2013 through 2018 in the stock of three public companies (Company A, Company B, and Company C) that, while enriching Defendants by millions of dollars, left retail investors holding virtually worthless shares.

73.     After reviewing over 1,200,000 records related to the allegations in the complaint, the SEC filed an amended complaint against the defendants in the SEC Action.[8]  The SEC did not bring any charges against Plaintiff or his firm, initially nor a year later when it filed the amended complaint.  The SEC did not bring any charges

---

[8] The docket in the SEC Action reveals the DOJ has been investigating the defendants in a parallel criminal proceeding.

against MabVax, its CEO or its CFO and did not mention MabVax in its complaint.  The SEC did not name Plaintiff as a relief defendant[9].  The SEC did not otherwise suggest in any way that Plaintiff was part of a "control group" or that he had engaged in any wrongdoing.  Plaintiff has never been informed that he is a target or subject of any investigation or lawsuit and neither has been named or contacted by the SEC, the United States Attorney, or any other regulator related to these matters.

74.    There is no information – not a scintilla of evidence – anywhere from which anyone could conclude or infer that any department or agency of the United States believed that Plaintiff had engaged in any wrongdoing in the case.

75.    Baker Botts and Shapiro, Neils, Locher and Hansen knew that there was no evidence linking Plaintiff to any "pump and dump" scheme and no evidence that Plaintiff was part of any "control group" of the companies, including MabVax, at issue in the SEC Action.

76.    They also had the documents and knew (a) that most of the investors first invested in MabVax in 2014*, at least a year before Plaintiff's hiring*, (b) that most of them *did not* invest in April-May 2015 as falsely alleged, (c) that they *did not know each other* and were independent funds or investors, and (d) that even when the investors (defendants in the SEC Action) invested, SEC reporting of ownership and negotiation of terms was under the guiding light of *other counsel*, namely Mintz Levin, Schulte Roth and Cooley, who had advised MabVax and the investors of their reporting obligations – not Plaintiff.

77.    In spite of the public record and evidence, Baker Botts and Shapiro, Neils,

---

[9] In the context of an SEC enforcement action, a relief defendant "is a person who holds the subject matter of the litigation in a subordinate or possessory capacity as to which there is no dispute." *SEC v. Cherif*, 933 F.2d 403, 414 (7th Cir. 1991).

Locher and Hansen persisted in their efforts to extort money out of Plaintiff.

**Baker Botts And Shapiro Instruct Their Client to "Manufacture" Facts And File False SEC Filings To Create The Illusion Of A "Control Group"**

78.    Baker Botts and Shapiro, Neils, Locher and Hansen knew that the SEC and DOJ had no claims to assert against Plaintiff. Baker Botts and Shapiro, Neils, Locher and Hansen also knew there was no evidence Plaintiff was part of a "control group" of MabVax under the Federal securities laws.

79.    In furtherance of the plan of extortion, Baker Botts and Shapiro, Neils, Locher and Hansen took a series of actions designed to create a malpractice claim against Plaintiff, to tie Plaintiff to the MabVax investors under investigation, and to threaten to assist the Government to expand its investigations. Baker Botts and Shapiro, Neils, Locher and Hansen (a) directed testimony by MabVax management to support the SEC theories against the investors; (b) went to the extreme and unprecedented length of waiving traditional protections, such as attorney-client privileges between Plaintiff and his former client Mabvax, in advance of their soon to be scheduled depositions and in document production; and (c) directed MabVax to file inaccurate SEC reports to manufacture a "theory" that they would use against Plaintiff in asserting their settlement demands – that is, that all 69 investors (including Plaintiff) actually constituted an illegal, unreported "control group" the SEC should pursue, who repeatedly violated the law, engaged in illegal pump and dump schemes, failed to disclose their control in violation of Federal securities laws, and, in Plaintiff's case, committed fraud and malpractice.

80.    Baker Botts and Shapiro, Neils, Locher and Hansen engaged in these actions despite the fact (a) that the investor-defendants in the SEC Action first invested in MabVax long prior to the March 2015 date, when the balance of the investors claimed to be a "group" (including Plaintiff) made their investment, (b) that beneficial ownership

blockers prevented voting control over MabVax for more than the requisite 60 day period required by SEC rules (the same advice Baker Botts gives its own clients) that avoid reporting beneficial ownership, and (c) that the investors invested separately and that many of them had no knowledge of each other and never met. Baker Botts and Shapiro, Neils, Locher and Hansen also ignored emails and documents that MabVax was fully aware and approved investments by Plaintiff, emails from the CFO that required him to invest more to not lose his investment, engagement letters that approved share ownership, express conflicts waivers and executed agreements that provided for payment of legal fees in shares of stock. Baker Botts and Shapiro, Neils, Locher and Hansen accrued $1 million in legal fees in just four short months of engagement, but failed to acknowledge any of these writings, instead using their position to criminally extort Plaintiff.

81.     In support of the extortionate "theory" presented in its settlement demands, Baker Botts and Shapiro, Neils, Locher and Hansen  went so far as to advise MabVax to file untrue, false and material misleading statements and reports with the SEC, repudiating the correct filings previously made, committing malpractice that led to the demise of its client, its delisting from NASDAQ and, ultimately, its bankruptcy filing. On May 20, 2018, acting on advice from Baker Botts and Shapiro, Neils, Locher and Hansen MabVax filed a Form 8-K with the SEC that repudiated four (4) years of SEC filings and financial statements:

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**FORM 8-K**

CURRENT REPORT
PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934

Date of Report (Date of earliest event reported): May 20, 2018

**MABVAX THERAPEUTICS HOLDINGS, INC.**
(Exact name of registrant as specified in its charter)

. . .

Item 4.02   Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.

To the extent required by Item 4.02 of Form 8-K, the disclosures in Item 8.01 of this Current Report on Form 8-K are hereby incorporated by reference.

82.    In directing, aiding and abetting MabVax's securities fraud, Defendants ignored fifty (50) years of SEC regulations, case law and practice to have MabVax incorrectly report that because of the "group" (consisting of up to 69 persons, including Plaintiff), MabVax's reported financial statements and votes were incorrect and could not be relied upon by investors or regulators. A beneficial ownership "group" under Federal securities laws is a defined and well-established technical term used in SEC Rules and Regulations. Defendants intentionally ignored the law. In this manipulated filing, Defendants wrongly placed Plaintiff within the "group"[10]. Baker Botts and Shapiro threatened to produce its findings on this matter to the SEC through the draft complaint.

---

[10] After May 20, 2018, MabVax continued to file false statements with the SEC that were engineered for the purpose of extorting money and property from Plaintiff. MabVax repeatedly made the following statements in its SEC filings:

*The Company has determined that, based on the facts and circumstances now before it, the beneficial ownership interests of members of the Aggregated Investors should be aggregated in order for the Company to comply with its reporting obligations. As of November 19, 2018, and absent a change in the facts and circumstances known by the Company, the Company will presume the Aggregated Investors beneficially own their shares of our capital stock as a group when construing the blocker provisions of our certificates of designation for all series of our preferred stock and when effecting conversions. Regarding matters in which our preferred holders are entitled to vote their shares on an as converted basis, we will record their votes after taking into account any applicable blocker provisions per the terms of the certificates of designation, again aggregating the beneficial ownership of the Aggregated Investors based on the facts and circumstances known to the Company as of any applicable record date.*

[https://www.sec.gov/Archives/edgar/data/1109196/000165495418013055/mbvxs1_nov5 2018.htm].

83.    Defendant's draft complaint threatened to identify Plaintiff as part of the "group" that had violated securities laws in numerous ways. The plain meaning of the document was that if Plaintiff did not settle and pay the exorbitant demand, Defendants would bring the allegations to the attention of the DOJ and SEC. Defendants threatened that the complaint would bolster the SEC's existing charges and place Plaintiff in the center of a "group" in activities not only involving MabVax, but involving numerous other companies the same investors had funded over the years which was also threatened. Defendants threatened to hand over Plaintiff to the SEC, if the matter was not settled, as the lynchpin behind all of the investors' alleged pump and dump and stock manipulations. Defendants represented that Plaintiff would be charged by the SEC, and that they would urge the SEC to expand its claims to more companies alleged to have been manipulated, and where Plaintiff had served as counsel. Defendants presented Plaintiff with the threat that he would be cast as the brains behind the investors' pump and dump schemes.

84.    Defendants believed Plaintiff was easy prey. To give up Plaintiff to the SEC as the culprit, all they had to do was get MabVax to make filings that supported the SEC theory that the investors were part of a beneficial ownership "group", and add Plaintiff to the "group" – just like others had when alleging that Plaintiff was part of the "Frost gang". However, their acts are illegal and unethical and knowing ignored known facts and violated the Rules of Professional Responsibility applicable to the attorney defendants involved.

85.    Baker Botts and Shapiro were engaged by MabVax after the company formed its special committee in May 2018.  In spite of its duty to defend MabVax from the very subpoenas that required the engagement of counsel in the first place, Baker Botts

and Shapiro did the opposite. Baker Botts, and then Neils, Locher and Hansen aided and abetted the fraud.   The entire special committee and every independent director resigned, resignations they were forced into submitting by similar threats likely made by Baker Botts wherein some of the directors, too, had served on boards or invested in other companies in purported association to Frost and other investors, while nonetheless being fully qualified and independent and having started an investigation into management's alleged malfeasance as alleged by the SEC in its formal order of investigation. This "Saturday Night Massacre" left the accused executives in their positions removing the very body charged with investigating them irreversibly conflicting Baker Botts which then turned to its illegal acts protecting, rather than investigating, David Hansen and Gregory Hanson, who were, in fact, the ones under investigation. Upon information and belief, Baker Botts also threatened to include special committee members in its referral to authorities should they not resign and give Baker Botts unfettered access to run MabVax and manipulate management into acts, false SEC filings, perjury, extortion and other activities which Baker Botts' as architect designed in order to entrench and protect these executives rather than assuring their investigation and potential removal from office and prosecution.

86.    On September 20, 2018, a Delaware Court of Chancery rejected entirely repudiation of MabVax's prior SEC filings and the accounting that Baker Botts insisted was incorrect. The Court confirmed the validity and accuracy of the original filings made by MabVax with the SEC.

87.    Plaintiff and his firm rejected Defendant's extortionate settlement demands. Defendant's threats were explicit and implicit – to ruin Plaintiff, to turn Plaintiff over to the SEC and DOJ in the investigations that Baker Botts and Shapiro knew, and to

encourage the SEC/DOJ investigations to be expanded to other issuers.

88.     Baker Botts is the second largest creditor in MabVax's bankruptcy. MabVax generates scant revenues and Baker Botts knew it could never be paid by MabVax, either before its Chapter 11 bankruptcy filing or afterwards. Baker Botts never intended to collect any fees from MabVax. Rather, Baker Botts knew that to be paid it would have to get payment from Plaintiff and set out to do so via a fabricated complaint it never intended to file.

89.     In September 2018, a small Boston, Massachusetts, contingency law firm, Block & Leviton LLP, filed an action in California Superior Court approved by the bankruptcy court against Plaintiff and every firm attorney/timekeeper that worked on MabVax making claims against them citing a multitude of the false allegations in the Baker Botts complaint. That action is being aggressively defended[11].  It is unknown what fee sharing arrangement exists between this firm and Defendants.

90.     Defendant's actions were illegal as a matter of law.

91.     The draft complaint and related communications constitute criminal extortion with intent to obtain money or property from Plaintiff. The draft complaint expressed or implied that Plaintiff would face criminal prosecution and civil liability if they did not pay. Defendants attempted to obtain a civil advantage – a $9,600,000 settlement – by the wrongful use of actual or threatened force, violence or fear.

92.     New York Penal Law § 155.05(2)(e) criminalizes the conduct engaged in by Defendants. That State statute provides as follows:

> "2. Larceny includes a wrongful taking, obtaining or withholding of another's property, with the intent prescribed in subdivision one of this section, committed in any of the following ways: …

---

[11] MabVax Therapeutics Holdings, Inc. v Sichenzia Ross Ference LLP et al., Civil Action No. 3:18-cv-0249-WQH-MSB (S.D. Cal).

(e)     By extortion.

A person obtains property by extortion when he compels or induces another person to deliver such property to himself or to a third person by means of instilling in him a fear that, if the property is not so delivered, the actor or another will:
…

(ii)    Cause damage to property; or

(iii)   Engage in other conduct constituting a crime; or

(iv)    Accuse some person of a crime or cause criminal charges to be instituted against him; or

(v)     Expose a secret or publicize an asserted fact, whether true or false, tending to subject some person to hatred, contempt or ridicule; or
…

(vii)   Testify or provide information or withhold testimony or information with respect to another's legal claim or defense; or

(ix)    Perform any other act which would not in itself materially benefit the actor but which is calculated to harm another person materially with respect to his health, safety, business, calling, career, financial condition, reputation or personal relationships."

93.    Title 18 U.S.C. § 875(d) criminalizes the conduct engaged in. That statute provides as follows:

"(d)    Whoever, with intent to extort from any person, firm, … or corporation, any money or other thing of value, transmits in interstate … commerce any communication containing any threat to injure the property or reputation of the addressee or of another … or any threat to accuse the addressee or any other person of a crime, shall be fined under this title or imprisoned not more than two years, or both."

Baker Botts and Shapiro, Neils, Locher and Hansen's threat to cause economic loss and reputational harm to Plaintiff was wrongful because they used the threats to obtain property to which they were not entitled. Defendants are guilty of extortion because they sought money or property to which they did not have, and could not reasonably believe they had, a claim or right. The threats had no nexus to a plausible claim of right. In *United States v. Michael Avenatti*, as here, such illegality has been applied to attorney settlement demands and letters. *See, e.g., United States v. Michael Avenatti*, Case 1:19-cr-

00373-PGG (S.D.N.Y.); id. *United States v. Litzenburg*, Case 3:19-mj-00069-JCH (W.D. Va.). Taking a page from lawyer Avenatti's playbook, Defendant's found a vulnerable company he would seek to convince to let him direct an "internal investigation", and would run up millions in legal fees. As reported in the New York Times article cited by prosecutors in New York in their case against Avenatti as he prepared to extort Nike – "*When a corporation is caught in a government investigation, the legal fees can quickly exceed $100 million – and that's before the lawsuits even begin*."[12]   They bulked up on investigation costs that he knew could not  be paid by MabVax and desperately motivated to get paid turned to illegal extortion as a motive to protect their own jobs, bonuses, draws, compensation and positions, having no other way to get paid.

A cross burning plainly conveys intimidation, without a spoken word.  *See* Elonis v. United States, 135 S. Ct 2001 (2015). Extortion involves a knowing threat being made. Defendants need not write a letter explicitly stating they intend to violate Section 875. They knew, conveyed, and meant to convey the threat through actions, deeds, and words. Meaning, context, and circumstance establish the criminal act.   Media reports and bloggers had already reported on Plaintiff's inevitable pursuit by the SEC and potential criminal prosecution which was well known by Defendants in August 2018.  Plaintiff and his partners fully understood what Defendant Shapiro meant when he approached them and so did they – a significant and newsworthy lawsuit with reputational, criminal and regulatory injury would follow if they were not paid.   A reasonable person would understand what Defendants meant and intended and the totality of the circumstances reveal their true intentions.

94.    Title  18  U.S.C.  §  1951  also  criminalizes  the  conduct  engaged  in  by

---

[12] [https://dealbook.nytimes.com/2012/03/05/the-mounting-costs-of-internal- investigations/].

Defendants. That statute provides as follows:

"(a)    Whoever in any way or degree obstructs, delays, or affects commerce …
by … extortion or attempts … so to do … shall be fined under this title or
imprisoned not more than twenty years, or both.

(b)    As used in this section-
…

    (2) The term 'extortion' means the obtaining of property from another,
with his consent, induced by wrongful use of actual or threatened force, violence,
or fear…."

95.    Section 802 of the Sarbanes Oxley Act of 2002 ("SOX") imposes criminal

penalties of up to 20 years imprisonment for altering, destroying, mutilating, concealing,

falsifying records, documents or tangible objects with the intent to obstruct, impede or

influence a legal investigation. Section 906 of SOX imposes criminal penalties for

certifying a misleading or fraudulent financial report.   Section 807 of SOX imposes

criminal penalties for defrauding shareholders of publicly traded companies (amending

Title 18, Section 1348): "Whoever knowingly executes, or attempts to execute, a scheme

or artifice (1) to defraud any person in connection with any security of an issuer with a

class of securities registered …. (2) to obtain, by means of false or fraudulent pretenses,

representations, or promises, any money or property …".   These statutes supplement and

are in addition to criminal statutes of general applicability violated by Defendants Baker

Botts, Shapiro and Hansen for perjury for false statements made to the SEC and the

Bankruptcy Court and other criminal securities law violations under the anti-fraud

provisions of the Securities Act of 1933, as amended, and the Securities Exchange Act of

1934, including Section 10 and Rule 10b-5 and Section 17 therof, all of which constitute

Defendant predicate acts and violations.   In carrying out the plan to extort a settlement

from Plaintiff, Defendants used wrongful and criminal means to achieve a wrongful

objective. They had no lawful claim to the money they sought. Backed by manufactured

46

evidence, false SEC and Bankruptcy court filings and fraudulent means, they used the threat of bad-faith litigation to exploit Plaintiff's fear of criminal prosecution, civil liability and economic loss into a settlement.

96.    Baker Botts and Shapiro's actions between 2018 and 2019 were fraudulent and criminal. On May 29, 2018 Shapiro sent a letter to Plaintiff:

> "Thank you for our meeting last week, and for your commitment to assist the transition of [] former legal representation of [MabVax] to successor counsel. As discussed, Company counsel with respect to the pending SEC investigation is our office, Baker Botts L.L.P and with respect to corporate and transactional matters is Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C."

Up to that point Plaintiff assisted the board and company in timely producing documents to the SEC, reviewed privileged documents to be withheld from the SEC to protect the client, and provided support to the Board for their investigation of management and formation of a special committee. Baker Botts misrepresented to Plaintiff that they needed documents and information from Plaintiff to answer the SEC subpoena. Plaintiff complied with Baker Botts' request in good faith. Baker Botts concealed the fact  that they intended to use the documents to craft a complaint against Plaintiff and that they would use to extort money and property from Plaintiff. Baker Botts and Shapiro utilized Plaintiff attorney files and immediately made demand for  $9,600,000 under the threat of creating a dust storm of controversy that would cast a cloud of illegal complicity by Plaintiff over matters already under investigation by the SEC and DOJ in their ongoing cases. Baker Botts drafted the complaint from a trove of personal, confidential and privileged internal emails and correspondence irrelevant to the merits of any matter, liberally quoting internal firm communications and emails to embarrass and bully – despite having been repeatedly advised in writing and orally, that as co-counsel they were duty bound to review and to protect all privileged and confidential materials from disclosure – instead providing a

trove of unreviewed privileged documents to the SEC and using them to craft their unfiled threatened demand letters and complaint.

97.    Plaintiff suffered damage and incurred substantial loss as a result of Baker Botts and Shapiro, Neils, Locher and Hansen's adoption, execution and continuation of the extortionate scheme, including through encouraging MabVax's complaint by contingency counsel in the bankruptcy.

## FIRST CAUSE OF ACTION –
## RICO AGAINST BAKER BOTTS, JONATHAN SHAPIRO, AND GREGORY HANSEN

General Allegations -

98.    Plaintiff restates paragraphs 1 through 97 of this Complaint, and incorporates them herein by reference.

99.    Defendants were part of an enterprise consisting of a union or group of individuals with a common purpose that are associated in fact.

100.   The enterprise has as its purpose extortion, the relationship of the parties consists of informal and formal agreements and understandings to cause harm, threaten, embarrass and defame through unsophisticated, brutal and unlawful means, with longevity - a scheme that commenced in 2014.

101.   The members of the enterprise are Defendants Baker Botts, Jonathan Shapiro, and David Hansen as well as individuals with whom they acted Daniel Fisher, Lee Pederson, Wesley Paul, Teri Buhl and William Alpert and unknown John and Jane Does.  They share common goals of extortion.  They direct their energies towards anyone who at any time was associated (socially, economically or professionally) with certain persons they believe have associations with the investors/the "Frost Gang" and are vulnerable to attack - whose common purpose was to enhance their reputation and seek

48

extortion payments, rewards and compensation from illegal actions and threats by means of their concerted actions and conspiracy to act.  Baker Botts illegally conspired with MabVax's management to bring investigations against uninvolved persons and deflect investigations directed at them.  They threatened to deflect the investigations onto Plaintiff should he not pay up.

Defendants Join the Ongoing RICO Enterprise and Adopt its Tactics -

102.  Defendants Baker Botts, Jonathan Shapiro, and Gregory Hansen joined in the enterprise in 2018. They extended its reach to include MabVax. They followed identical tactics employed since 2014.  The purposes of the enterprise are to collect sums from companies, entities and professionals who were associated with Dr. Philip Frost, as was Plaintiff by representing companies in which he and others invested, and additional persons who developed the investment strategies with him. Dr. Frost and others invested in MabVax in 2014-2015. Plaintiff served as legal counsel to MabVax and to Biozone, caught their attention and was added into the enterprise's snare. He garnered the attention of the enterprise solely because of those relationships and role. In 2018 Defendants made identical false claims concerning Plaintiff as had been made since 2014 against Plaintiff by the ongoing enterprise, when it expanded from Biozone to other companies, the draft complaint going so far as to threaten to describe other clients of Plaintiff that would terminate his representation if filed (Polarity, Riot Blockchain) where the investors served as officers or directors.  None of those companies are being pursued for false reporting (nor have they disavowed years of prior financial statements) nor are claims being threatened against the investors for their involvement as management or investors. After Block Leviton filed their complaint, both of those companies terminated Plaintiff's firm as counsel.

The Case Parallels Between 2014 and 2018 Are Persuasive -

103.   The cases have many similarities. Each company had counsel with unpaid amounts claimed to be owing by the company. Each company claimed it was the victim of abuse by its Frost investors. Each company threatened to publicize, encourage law enforcement action and bring civil suit. Each company had no evidence of wrongdoing.

104.   Lee Pederson, Esq. is an attorney who worked for Biozone.  Lee Pederson founded the enterprise in 2014 with Dan Fisher and another attorney. He knew there was no basis to accuse the investors in Biozone, particularly Plaintiff, but instead lodged a multitude of charges, solicited media, filed whistleblower claims and civil suits. With regard to Plaintiff, he alleged a multitude of unproven and imagined misdeeds as counsel to Biozone in the press, blogs and to the authorities. He acknowledged in later court filings that he and others received payments from Biozone as the enterprise ringleader he successfully executed its purpose.

Tactics Developed in 2014 Are at the Center of the Defendants' RICO Violations -

105.   Tactics utilized against the "Frost gang" have been employed across a multitude of companies. Starting with Biozone Lee Pederson lumped plaintiff with the Frost gang garnering media attention, law enforcement referrals, and lawsuits. Utilizing false statements and imagined injury Pederson and his cohorts sought to force the Frost investors to pay up. Pederson and the enterprise attacked plaintiff too merely  for representing Biozone and viciously attacked plaintiff publicly for knowing the investors making not a single specific claim of any improper act. Lee Pederson caused many articles and stories to be published falsely associating plaintiff with the claim that the investors had broken the law although later admitting he had no proof of any laws broken. He continues to defame and secure writers to defame plaintiff through the time of

filing of this complaint on his blogs and elsewhere.

106.   The 2014 Biozone claims by the RICO enterprise made against plaintiff were made through false reporting, character assassinations to reporters, letter writing to boards of directors, solicitation of regulators to sue plaintiff, threats and intimidation. Once Defendants became involved joining the enterprise they adopted tactics that were designed to get the same result, involving the same cast of characters, included threatening to report false information about Plaintiff to regulators and divert regulatory scrutiny away from MabVax to Plaintiff should he not pay.

107.   Dr. Frost and other investors invested over $30 million in Mabvax and were sued by the SEC and MabVax.  Defendants in their threats cast plaintiff as a principal actor in the SEC accusations of the MabVax "pump and dump" scheme and sought $9.6 million from Plaintiff and his firm. Defendants led this campaign through false and unproven allegations in order to recover their unpaid legal fees, which were not able to be paid from cash flow of MabVax prior to bankruptcy.

108.   Positioning themselves as a creditor Baker Botts holds the second largest debt owed by MabVax. However, it was Defendants own actions that caused MabVax to file for bankruptcy. MabVax viability as an going concern was destroyed beyond repair by the actions of Defendants as they sought to eliminate criticism over waste and mismanagement, failed drug trials and false promises and lack of results in the development of potentially life-saving technologies the investors had supported over 5 years' time. In their quest to cut ties to the investors who were calling for their heads Defendants stepped over the line.  Baker Botts is currently also counsel to MabVax in a separate suit with virtually identical allegations against the investors.

Baker Botts, like Lee Pederson, makes demand for $9.6 million from Plaintiff to Curtail his Campaign and Avoid a Lawsuit-

109.   Baker Botts communicated with the other Defendants the plan of action, and then demanded from Plaintiff extortion in the amount of $9.6 million - the exact amount claimed in the bankruptcy[13] as the value of certain shares issued by MabVax when seeking waivers to certain restrictions (consent rights) for additional financings.   But MabVax was represented by none other than Mintz Levin attorneys and the investors were represented by their own separate counsel.   Hoping that a federal investigation of Plaintiff would ensue on which they would piggyback their efforts in order to exact their extortion, Defendants had to utilize any and all means to bring about the hoped federal investigation and prosecution by the government of Plaintiff. The threat was that if they should bring the lawsuit, although knowing the allegations to be false, it would be near impossible for Plaintiff to refute and cost hundreds of thousands of dollars in legal fees for Plaintiff to defend.   Defendants knew that implicit in their threats were that the government with an unlimited budget would do the heavy lifting necessary to assert Plaintiff's misdeeds and even if dismissed in a year or more, Plaintiff's insurance would be exhausted and he would be ruined.   It was not a far stretch for Defendants to believe that the insurer and Plaintiff would rather pay Defendant's demands quietly than suffer embarrassment and financial ruin, despite the fact that Baker Botts' had no intention of filing any lawsuit and knew of the gross lies and inaccuracies it contained. This did not stop Defendants from continuing to falsely state Plaintiff was responsible to management of MabVax, the SEC regulators investigating management, the press, bankruptcy lawyers and threatening plaintiff to demanding cash payment of $9.6 million. This despite a trove

---

[13] "The statements made herein regarding the Alleged Bad Actors are based entirely on the allegations in the Alleged Bad Actor Litigation and Sichenzia Litigation. As such, they remain only allegations." See Second Amended Disclosure Statement and Joint Plan of Liquidation for Debtors filed January 9, 2020 Chapter 11 Case No. 19-10603-JTD, *In re; MabVax Therapeutics, Holdings, Inc., et al., debtors* (D. Del), at 18.

of documents, records and witnesses which prove plaintiff recused himself entirely from such matters when serving as MabVax co-counsel with Mintz Levin.

Baker Botts Relies only upon self-serving oral statements from David Hansen –

110.   Without any supporting documentary or factual evidence, Defendants relied only on untrustworthy oral statements from Hansen ignoring dozens or hundreds of written documents and emails in their possession collected in response to the SEC subpoena and otherwise, Defendants crafted the draft complaint use to attempt to extort plaintiff. Defendants made their terms clear – settle or we will get the SEC to take you down. Without any action whatsoever thereto being taken by the SEC against MabVax, its officers or directors, or against plaintiff or his law firm incorporating any of the charges that an undisclosed group of Frost investors controlled MabVax who failed to file their own SEC ownership reports, that MabVax incorrectly calculated beneficial ownership and permitted blockers to be evaded by investors who were a group based upon alleged improper legal advice from plaintiff, Defendants nonetheless made these allegations the central issue in the draft complaint, thereafter directed counsel for the bankrupt company to issue bankruptcy court filings repeating these allegations, informed the SEC and possibly DOJ, and upon information and belief communicated such claims to reporters.

111.   Defendants manipulated and contorted the entirety of the bankruptcy process once MabVax filed for Chapter 11 bankruptcy to gain advantage for their plan. They sought to convince the court to allow them to earn legal fees to the detriment of the actual creditors of MabVax. This   was achieved by continuing their false and fraudulent narrative and misrepresenting material facts – the same and other facts alleged in the unfiled complaint - to the bankruptcy court and interested parties in the case who, to date,

have failed to be provided with accurate and objective information so that they may object to any claims submitted. Rather than pursuing management who actually defrauded the investors.

<u>Baker Botts' Services Were not Routine Legal Services – They Repeatedly Violated the Rules of Professional Responsibility, Revealed Confidential and Privileged Client Information, Rendered Negligent and Incorrect Legal Advice and Secured Board of Director-like Control over Decisions Made by MabVax After Overseeing the Board's Resignation –</u>

112.   Defendants did more than perform routine professional services for MabVax.

Their acts went further than that by:

1) intimidating the entire independent board of directors investigating management after claims were made against David Hansen and Gregory Hanson by the SEC;
2) forcing every independent director into resigning and terminating the special committee;
3) conspiring with management under investigation and causing the rendering advice causing members of management to breach their fiduciary duties;
4) violating the Code of Professional Responsibility applicable to lawyers by the foregoing actions and also by defending targets of the SEC investigation after previously having been engaged as its counsel to respond to the SEC subpoena and defend MabVax
5) advancing the interests of Hansen and Hanson to maintain their employment and positions with MabVax and derail investor concerns by designing and implementing "anti-takeover" protection by litigating with investors and seeking to cause agencies and regulators to investigate the investors, all undisclosed tactics required to be disclosed in SEC filings and reports under the Williams Act and other statutes, rules and regulations,
6) failing to protect the investing public;
7) committing numerous additional violations of the Code of Professional Responsibility such as representing members of management simultaneously with the client that had engaged them to respond to SEC inquiries, misleading counsel and violating their duties to the California bar, misleading counsel, the bankruptcy court and other courts, violating confidences and failing to protect attorney-client and work product privileged information to the detriment of MabVax;
8) acting dishonestly to co-counsel with the intent and purpose of extorting $9.6 million instead of honestly and faithfully assisting co-counsel with its efforts to timely and accurately respond to the pending SEC subpoena and inquiry;
9) aiding and abetting management in the filing of false and misleading SEC filings and reports containing untrue statements of material fact and material omissions in violation of Section 10 and Rule 10b-5 promulgated under the Securities Exchange Act of 1934, among other statutes, rules and regulations;
10) making false allegations of undisclosed "groups" and investor collusion by

plaintiff;

11) failing to correct misstatements and false filings and reports made by the SEC following determination by Delaware courts that the company's filings complied with well-established law and legal principles governing beneficial ownership, groups and blockers, the very same rules, principles and advice routinely provided to and followed by Baker Botts very own clients in their public SEC filings and reports (the "Non-Reliance" 8-K and Registration Statement on Form S-1");

12) threatening to embarrass and defame co-counsel unless their extortion claims for payment of $9.6 million were met "within 3 days";

13) threatening by means of interstate commerce and the mails the foregoing and the commencement of litigation, not in advance of any litigation since no lawsuit or action was ever brought by Baker Botts;

14) taking money and property from MabVax under false pretenses to advance their criminal conspiracy while representing the very management of MabVax as to whom they were engaged to conduct an internal investigation, in an unwaivable conflict of interest;

15) advancing the purposes of the enterprise by demanding and receiving payment of millions of dollars from their client in retainers and legal fees while advancing the extortion for the enterprise and in the bankruptcy they themselves were responsible for;

16) suborning perjury before federal and state government officials and agencies; and

17) enticing other participants to join in and take part in the illegal and criminal extortionate activities, to serve as their agent under their control and authorization, conspiring with third-parties to represent them in their extortionate plots, including the law firm Block and Leviton, LLC.

Through these activities, upon information and belief, Defendants fed false information to media and bloggers to create the appearance of genuine reporting and investigative research that would support their claims and pressure plaintiff to pay the extortionate demands and to regulators and investigators seeking to induce the initiation of actions so that they would be able to bring suit after the government relying on the government to prove facts in their case forcing settlement, all in continuation of the enterprises' core plan to harass and intimidate persons associated with Frost investors in which Baker Botts and Shapiro willingly joined.

113. Defendants committed predicate acts by aiding and abetting existing enterprise participants Lee Pederson, Wesley Paul, Daniel Fisher, Teri Buhl, William

"Bill" Alpert, and others in the enterprise's extortionate campaign lodged against Frost and other investors as the targets of their scheme whom they called the "Frost gang" lumping plaintiff, an attorney, together with the gang in court proceedings, letter writing, whistleblower claims and articles they commanded labelling him as a criminal. Instead it was the aforementioned participants in this illegal extortion ring that are the bad actors and criminals, who face prosecution for their crimes.

Defendants' Game Plan Is the Enterprise's Playbook -

114.    The initial enterprise participants, Lawyer Lee Pederson, lawyer Wesly Paul and Biozone/COCP executive Daniel Fisher, structured an illegal enterprise in 2014 after a dispute arose over payment by Frost and investors. As chronicled in their own lawsuits, the enterprise was expanded over time and included additional participants. By 2018 Defendants joined the enterprise. They adopted tactics, processes, false claims and strategies that were successfully deployed to obtain payments from investors in Biozone/CoCrystal in their effort to extort Plaintiff.

115.    Pederson in his 2019 complaint[15] states:

> *Pederson and Fisher worked together with each other under a general collaborative agreement to help each other seek redress for the harms caused to them by Frost and his gang.*

---

[15] *Lee Pederson vs. Phillip Frost, CoCrystal Pharma, Inc., and Daniel Fisher,* (D. Minn) No 19261777 JNE/DTS (July 8, 2019).

*Pederson's and Fisher's desired outcomes included criminal prosecutions and convictions of Frost and his gang members, publication of descriptions of Frost gang frauds and crimes, monetary awards from civil litigation against Frost and other gang members, monetary awards from SEC whistleblower complaints, and court-ordered restitutions from Frost gang members.*

*Pederson and Fisher used a three-prong strategy against the Frost gang: (a) civil litigation, (b) supplying Federal law enforcement agents with research, information and evidence about the Frost gang's frauds, and (c) providing inaccurate information to journalists and business writers.*

*Eventually their joint efforts resulted in active investigations of the Frost gang by the SEC and DOJ (FBI and U.S. Attorney's Office). They also aided a network of journalists and business writers who wrote and published stories about the gang's activities. Fisher's civil litigation against the gang put additional pressure on the gang.*

116.   After several years' time, the participants began to war with each other over the spoils of their illegal activities and litigation ensued. A great deal can be learned about the inner workings of the enterprise from this lawsuit:

*The Frost gang saw the joint efforts of Pederson and Fisher as a threat. To ease this threat, they offered Fisher a deal behind Pederson's back. ... Frost exerted his control over Defendant COCP to cause COCP to provide a benefit of about $800,000 to Fisher at the expense of COCP shareholders, including Pederson. ... The $800,000 benefit to Fisher was intended to buy Fisher's silence and stop Fisher's collaboration with Plaintiff Pederson. .... Fisher went behind Pederson's back and settled his litigation against the Frost gang with a deal that unjustly enriched Fisher by an amount of about $800,000 while selling out Fisher's promises to Pederson. Fisher profited financially from the deal, and Frost temporarily profited by making Pederson's efforts to seek redress against Frost and his gang much more difficult.*

Various parties joined (and left) the enterprise over time:

*On about October 18, 2014, Fisher announced to his other attorneys that Pederson was a member of Fisher's legal team, along with Wes Paul and Jason Hoffman". Complaint, Par 69. Wes Paul subsequently collaborated with Teri Buhl to defame and disparage plaintiff and promote the writing of false and fictional stories about Plaintiff lumping him together with the Frost gang repeatedly. "From 2014 to 2017, Pederson and Fisher worked together using the three-prong strategy against the Frost gang. Pederson and Fisher worked on all three aspects of the strategy: (a) civil litigation; (b) press coverage; and (c) Federal law enforcement." Id at 72. Pederson and Fisher  began  their collaboration with relatively scant material and evidence against the Frost gang,*

*except for what they know about the gang from first-hand experiences regarding frostzone. However, they had both been harmed by the Frost gang, and they shared an absolute certain conviction that Frost and his gang members were fraudsters and criminals.*

By 2015, the enterprise was in full swing and on March 25, 2015 Fisher wrote:

*The only way for us to come out ahead in this case is to transfer the pain to the defendants. Otherwise, I am wasting my time and money. With the note case, the Frost Group has suffered no pain. Stalling, driving up our costs, and managing a slow moving case is the frost Group's game plan. ... They need to know that we are threat to them since we will cooperate with the SEC and DOJ to damage them. And, we will have the cooperation of the press in researching and publishing the findings. This will allow us to take the offense." Id at 80. "they are extremely cheap, hate to lose, facing criminal prosecution, and adverse PR. As the case progresses, more of their criminal acts will be exposed which is newsworthy.*

Throughout this period before 2018 Fisher, Pederson and the other members of the enterprise grew. They alleged in the press and to government that plaintiff committed illegalities and included Plaintiff as a member of the Frost gang, writing stories and articles and threatening to bring to the attention of the agencies more information connecting plaintiff to alleged illegalities and wrongdoing with conclusory statements, defamation and false reporting. Fisher's June 20, 2018 email to Chris Carey reveals the extortion successes that were beginning to emerge and states:

*Lee is attempting to milk us for money which we don't have. It is my feeling that he feels anxiety about the future of his case which is causing him to scramble to raise money. ... I want to have deniability of communicating with him. But this request is coming from a guy that is nuts, and I have learned to be careful when negotiating with unpredictable crazies. ... Lee's advice was of no use, and it may have been harmful to our case.*

117.  The unlawful and criminal enterprise in which Defendants joined in 2018 had since 2016 been responsible for launching a tirade of defamatory articles that included false and fabricated statements about plaintiff all instigated by Pederson, Fisher, Paul as to which Buhl, Alpert, Barron's, all became participants in the illegal enterprise

by publishing falsities about plaintiff. They lumped plaintiff together with Frost – Barron's going so far as to report plaintiff as the "center" of the pump and dump ring with an article entitled - "The Lawyer at the Center of SEC Pump-and-Dump Case" is the subject of a pending action in the Southern District of Florida.

118.    After learning of the enterprises efforts and joining the enterprise, Defendants worked with the Biozone/COCP campaign and deployed identical tactics. They used lies, false statements and misrepresentations as the tools to extort plaintiff in the manner employed against the Frost gang. Shapiro and Baker Botts formulated their plan and made the following false statements to government officials, their client, and others in an effort to get plaintiff to pay:

A)    Plaintiff advised MabVax in a manner that favored investors rather than his client in regard to the consent right. This statement is false. Plaintiff refused to provide advice on the consent right. Rather Mintz Levin served as counsel and advised David Hanson and MabVax on the consent right. During 2015 Plaintiff wrote emails and orally informed MabVax that he and his firm declining to provide advice to MabVax on matters related to the investors.

B)    Plaintiff was responsible for MabVax issuing $9.6 million in shares to investors. This statement is false. Plaintiff refused to provide advice  on negotiation of the settlement, waiver or approvals under the consent right that resulted in issuance of any inducement shares to investors. Rather, Mintz Levin served as counsel and advised David Hansen and Gregory Hanson on all these matters, on enforceability of the consent after transfer of shares, and all other mattes regarding contractual obligations to the investors, the Oxford financing if is required consent, and issued the legal opinions on such matters.

C)    Plaintiff was responsible for MabVax failing to report "group" issues in accordance with SEC rules and regulations by asserting in the complaint and to third parties that Plaintiff failed to advise and disclose that a number of its largest investors … were acting in a manner such that federal regulators would consider the Investors to be an unlawful 'control group' for purposes of the United States securities laws …. This statement is false. Plaintiff never provided advice to the investors or MabVax on beneficial ownership group reporting. Rather Mintz Levin, Cooley and Schulte served as counsel and advised David Hanson and MabVax on the group reporting. Reporting protocols were established nearly a year prior to Plaintiff's engagement, when the Telik transaction was being prepared. Plaintiff wrote numerous emails to MabVax to assure MabVax obtained current and accurate facts on which to rely – asking repeatedly to have

questionnaires sent to the investors to ascertain their holdings.

D)      Plaintiff was responsible for MabVax losing the confidence of investors by alleging as follows in the draft complaint … "[N]ow that the frailty of the of the Sichenzia/Plaintiff 'blocker' firewall has been revealed, MabVax no longer has confidence that the 2,628,766 shares of common stock issued to Investors via preferred share conversions are valid and also cannot be certain its previous reports regarding the number of common shares outstanding are accurate". Jonathan Shapiro promoted novel never before heard of legal theories that blockers are ineffective, all the while his firm provided the exact same advice regarding blockers to its other clients, in articles, client memoranda and presentations. MabVax at all times used principles for reporting and blocker provisions that re universal, follow federal law, and have been validated by the Delaware chancery court, specifically as relate to MabVax claims made by Baker Botts/Shapiro.

E)      Plaintiff was responsible for the decision to disavow three prior years of financial statements and SEC reports and delisting from NASDAQ. Upon learning that MabVax made such filing without his knowledge and consent Plaintiff and the firm promptly resigned to show their disagreement with the legal advice given by Baker Botts and Mintz. Shapiro stated it was Plaintiff  that required this action given his improper advice. There is no basis for this allegation. MabVax followed the same principles espoused by Baker Botts in its advice to other clients up until the time that Jonathan Shapiro took the unprecedented action of creating new and unknown legal reporting principles for MabVax to follow that aggregated ownership across up to 69 separate investors so that they could not vote together to unseat management in their executive positions through exercise of their rights under state law as shareholders and vote more than 4.9% altogether. Shapiro communicated to numerous people, such as lawyers for the bankruptcy estate after which this lie became part of the bankruptcy estate pleadings and process, that this never before heard of proposition was correct legally, despite such evidence to the contrary that includes a court order in the Delaware chancery court, the failure of the SEC to take any such position (including before the Delaware chancery court during the pendency of such case), the failure of the SEC to bring any action against MabVax for incorrect filings that were disavowed or against any person who was an investor that adopted such position.

119.   Defendants knew of all the aforementioned falsities and are wholly-responsible themselves for the collapse of MabVax, the loss of investor confidence and the ultimate bankruptcy that ensued – the direct result of their illegal enterprise.

120.   The SEC and DOJ whistleblower complaints by the enterprise, with all their glorious attestations, subsequently were withdrawn or denied by the agency. "On August 24, 2015 SEC Whistleblower Chief Sean McKessy called Pederson at 2:13 pm central

time …. McKessy informed Pederson that the SEC would not take any action based on Pederson's whistleblower complaints." Pederson stated, "This is far from over". Following such rejection, the enterprise threatened action against SEC Chairman Jay Clayton for corruption in an open letter.[14] Similarly the SEC has brought no action that names MabVax, its managers or plaintiff despite extensive effort and opportunity. Once Defendants took the helm of the enterprise to threaten suit for a $9.6 million extortion he pursued the very same tactics – referrals to DOJ and the SEC, lawsuits, and providing information to reporters, the media, and seeking to put meat on the bones of his false statements through recruiting of other enterprise members. The members of the enterprise are related (attorney/client, researcher/writer, employee/employer, principal/agent). They worked together between 2014 - 2020 to pursue and achieve a common purpose by unlawful means. Their actions are continuing.

Baker Botts and Jonathan Shapiro's Rico Violations – 18 U.S.C Section 1962(c)

121. Plaintiff has been injured in his business and property by reason of Defendants' multiple violations of Title 18 U.S.C. § 1962, described above and engaged in at least two acts of racketeering activity (acts or threats of extortion chargeable under New York law and punishable by imprisonment for more than one year, mail fraud and wire fraud, and interference with commerce by extortion or threats to do so in violation of the Hobbs Act) as well as making false statements and suborning perjury, one of which occurred after the effective date of Part 1, Chapter 96 of Title 18 of the United States Code and the last of which occurred within ten years after the commission of a prior act

---

[14] *Pederson v Clayton*. My letter to Clayton can be seen at: https://www.scribd.com/document/433709218/191106-Open-Letter-to-Jay-Clayton I expect that the SEC will not address my concerns in a meaningful way. Therefore, at an appropriate time and after framing the issues with Freedom of Information Act (FOIA) requests, I intend to bring a lawsuit against Chairman Clayton to discover what has been going on inside the SEC with respect to Phillip Frost and his gang.

of racketeering activity. They operated or managed an enterprise through a pattern of racketeering activity that caused Plaintiff concrete financial loss and other harm. They knowingly and purposefully adopted, implemented, controlled, conducted and participated in a scheme or artifice, the direct purpose of which was to extort money or property from Plaintiff and his firm. The business of the enterprise – extortion – is primarily unlawful. The criminal activity is continuous because extortion was the regular way of operating the business. Their criminal activity by its very nature projects into the future. Their racketeering activity (including their own fraudulent concealment, securities fraud, conspiracy with MabVax management, and extortion during the ongoing SEC investigation), its relatedness, breadth and the period of time over which they persisted with the scheme, is such that there is a threat that it will continue indefinitely and be repeated in the future.

122.   As a direct and proximate cause of Defendants' violations of Title 18 U.S.C. § 1962 (c), Plaintiff suffered injury and loss of property in the amount of $10,000,000.

123.   Defendants conspired with other participants in the enterprise in violation of 18 U.S.C. § 1962 (d) to violate 18 U.S.C. § 1962 (c).

124.   In accordance with 18 U.S.C. § 1964(c), Plaintiff seeks threefold the damages he has sustained, the costs of this suit, and reasonable attorney's fees incurred.

125.   In accordance with 18 U.S.C. § 1964(d), Plaintiff seeks an injunction against all participants in the enterprise to prevent and restrain further violations of 18 U.S.C. § 1964(c).

## SECOND CAUSE OF ACTION –
### DECEPTIVE ACTS AND PRACTICES IN BUSINESS AGAINST BAKER BOTTS, JONATHAN SHAPIRO, LYNN NEILS, DAVID LOCHER AND GREGORY HANSEN

126.    Plaintiff restates paragraphs 1 through 125 of this Complaint, and incorporates them herein by reference.

127.    Defendants Baker Botts, Jonathan Shapiro, Lynn Neils, David Locher and David Hansen' threats of publication of defamatory knowing falsehoods about Plaintiff and their extortion of Plaintiff constitute deceptive acts and practices in the conduct of business, trade or commerce. Defendants deceived Plaintiff's law partners, his client MabVax, and others into the belief they would lodge suits and direct their efforts towards disclosing embarrassing matters publicly, and to regulators, to deceive them into pursuing Plaintiff.  Defendants deceived each other to cause them to take certain of the actions complained of requiring corporate actions, sworn statements, or preparation for suit. Defendants' actions violate General Business Law § 349(a) and are unlawful.

128.    Defendants' willful methods, acts, or practices were consumer-oriented and misleading. Defendants' conduct involved an extensive extortion scheme involving the dissemination of information to the public. Defendants' actions have the potential to affect consumers at large.

129.    Plaintiff suffered injury and loss as a result of acts or practices that violate General Business Law § 349.

130.    Plaintiff brings this action against pursuant to General Business Law § 349(a) to recover to actual damages, plus attorney's fees and court costs, in the sum of $10,000,000.00 or such other amount as is determined by the Jury. In addition to damages, attorney's fees and costs, Plaintiff seeks a declaratory judgment that acts and practices violate § 349(a) and an injunction to prevent Defendants from violating the Act in the future.

## THIRD CAUSE OF ACTION –
## TORTIOUS INTERFERENCE AGAINST BAKER BOTTS, JONATHAN SHAPIRO AND GREGORY HANSEN

131.    Plaintiff restates paragraphs 1 through 130 of this Complaint, and incorporates them herein by reference.

132.    At the time Defendants extorted Plaintiff, Plaintiff had valid and enforceable contracts, partnership agreements and business expectancies in his law firm partnership and with his clients. Plaintiff had a reasonable expectation of earning substantial income from continuing those business relationships.

133.    Defendants Baker Botts, Jonathan Shapiro and Gregory Hansen knew about Plaintiff's interest and his law practice, contracts and business expectancies.

134.    Defendants intentionally interfered with Plaintiff's property rights and business expectancies by, inter alia, devising, aiding, abetting and actively participating in the scheme to extort money or property from Plaintiff and to injure him in his business and reputation.

135.    Defendants improper methods, actions and practices were, inter alia, defamatory, unethical, oppressive, over-reaching, fraudulent, hostile, sharp, and criminal. interference was completely unjustified.

136.    As a direct result of Defendants' tortious interference with Plaintiff's contracts and business expectancies, Plaintiff suffered damage and incurred loss, including, without limitation, injury to his business, loss of clients, damage to his reputation, prestige and standing, attorney's fees, court costs, and other damages in the sum of $10,000,000.00 or such other amount as is determined by the Jury.

## FOURTH CAUSE OF ACTION –

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST BAKER BOTTS, JONATHAN SHAPIRO, LYNN NEILS, DAVID LOCHER AND GREGORY HANSEN

137. Plaintiff restates paragraphs 1 through 136 of this Complaint, and incorporates them herein by reference.

138. Defendants Baker Botts, Jonathan Shapiro, Lynn Neils, David Locher and Gregory Hansen's conduct, detailed above, was intentional, reckless, concerted, criminal and deliberately violative of applicable Rules of Professional Conduct. They engaged in a series acts that, taken together, constitute extreme and outrageous behavior. They purposefully initiated a campaign to extort money or property from Plaintiff, by, *inter alia,* maliciously threatening to defame him with scandalous accusations of criminal conduct, destroy his securities law practice, and turn him over to DOJ and the SEC. In spite of their knowledge that Plaintiff had engaged in no wrongdoing of any kind, Defendants proceeded with their extortionate plan. As part of that plan, they directed MabVax to make untrue and material misleading statements to the SEC, and assisted their client in filing multiple fraudulent reports with the SEC over a long period of time. Defendants' conduct was flagrant and heartless.

139. Defendants actions offend against generally accepted standards of decency and morality and are atrocious and utterly intolerable. They are attorneys. They knew that their illegal actions would cause severe emotional distress.

140. Their outrageous conduct caused Plaintiff to suffer severe emotional distress, extreme fear and panic.

141. Defendants' misconduct constitutes intentional infliction of emotional distress.

142. As a direct result of Defendants' misconduct, Plaintiff suffered damage and

incurred loss, including, without limitation, pain and suffering, physical injury, severe emotional trauma, insult, embarrassment, humiliation, public ridicule, anguish, stress and anxiety, injury to reputation, special damages, medical expenses, attorney's fees, costs and out-of-pocket expenses in the sum of $10,000,000.00 or such greater amount as is determined by the Jury.

### FIFTH CAUSE OF ACTION –
### PRIMA FACIE TORT AGAINST BAKER BOTTS, JONATHAN SHAPIRO, AND GREGORY HANSEN

143. Plaintiff restates paragraphs 1 through 142 of this Complaint, and incorporates them herein by reference.

144. In their attempts to extort payment of $9,600,000 from Plaintiff, Defendants Baker Botts, Jonathan Shapiro, and Gregory Hansen intentionally inflicted harm on Plaintiff without excuse or justification. Their statements and actions were motivated by disinterested malevolence, malice, and the desire to extort a settlement from Plaintiff without litigation.

145. As a direct result of Defendants' actions, Plaintiff suffered special damages and incurred loss, including, without limitation, injury to his business and property, loss of clients, damage to his reputation, prestige and standing, attorney's fees, court costs, and other damages in the sum of $10,000,000.00 or such other amount as is determined by the Jury.

### SIXTH CAUSE OF ACTION –
### VIOLATION OF JUDICIARY LAW § 487 AGAINST BAKER BOTTS, JONATHAN SHAPIRO, LYNN NEILS, DAVID LOCHER AND GREGORY HANSEN

146. Plaintiff restates paragraphs 1 through 145 of this Complaint, and incorporates them herein by reference.

58

147.    In the draft complaint, Defendant manufactured and repeated multiple patently false statements as a part of a scheme to extort a settlement from Plaintiff.

148.    Defendants Baker Botts, Jonathan Shapiro, Lynn Neils, David Locher and Gregory Hansen are guilty of deceit[15] or collusion with the intent to deceive Plaintiff, and the Superior Court for the State of California. Defendants' deceit and collusion was both directed at the Court and it occurred during the course of a judicial proceeding.

149.    Defendants' misrepresentations, deceit, and collusion constitutes misconduct under New York Judiciary Law § 487.

150.    As a direct and proximate result of Defendants' misconduct, Plaintiff suffered substantial injury and loss of property, including the payment of attorneys' fees and costs, pain and suffering, physical injury, severe emotional trauma, insult, embarrassment, humiliation, public ridicule, anguish, stress and anxiety, injury to reputation, special damages, medical expenses, costs and out-of-pocket expenses in an amount to be determined by the Jury.

151.    In accordance with New York Judiciary Law § 487, Plaintiff seeks treble damages to punish Defendants and to deter them from betraying their special obligation to protect the integrity of the Court and foster their truth-seeking function.

Plaintiff alleges the foregoing based upon personal knowledge, public statements of others, and records in his possession. Plaintiff believes that substantial additional evidentiary support, which is in the exclusive possession of Baker Botts, Shapiro,

---

[15] *Deceit*" means "the act or process of deceiving (as by falsification, concealment, or cheating)." *Kawashima v. Holder*, 132 S.Ct. 1166, 1172 (2012) (citing Webster's Third New International Dictionary 584 (1993)); *see id. Amalfitano v. Rosenberg*, 428 F.Supp.2d 196 (S.D.N.Y. 2006) (adopting definition from Black's Law Dictionary (8th Ed. 2004) ("Deceit" includes: (1) The act of intentionally giving a false impression … (2) A false statement of fact made by a person knowingly or recklessly (*i.e.* not caring whether it is true or false) with the intent that someone else will act upon it … (3) A tort arising from a false representation made knowingly or recklessly with the intent that another person should detrimentally rely on it.).

MabVax, and their agents and other third-parties, will exist for the allegations and claims set forth above after a reasonable opportunity for discovery.

Plaintiff reserves the right to amend this Complaint upon discovery of additional instances of the Defendants' defamation and wrongdoing.

## <u>CONCLUSION AND REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests the Court to enter Judgment against Baker Botts, Jonathan Shapiro, Lynn Neils, David Locher and Gregory Hansen jointly and severally, as follows:

A.      Compensatory damages in the amount of $10,000,000.00;

B.      Threefold damages in the sum of $30,000,000.00;

C.      Punitive damages in the amount of $5,000,000.00 as a result of the Defendants' specific intent to harm Plaintiff and the actual harm inflicted on Plaintiff;

D.      Prejudgment interest on the principal sum awarded to Plaintiff by the Jury from May 15, 2018 to the date of Judgment at the maximum rate allowed by law;

E.      Post judgment interest at the maximum rate allowed by New York law;

F.      Costs and such other relief as is just and proper.


**TRIAL BY JURY IS DEMANDED**

DATED:        June 4, 2020

HARVEY J. KESNER

By:   */s/ Robert C. Buschel*
      Robert C. Buschel, Esq.
      Florida Bar No. 0063436
      BUSCHEL GIBBONS, P.A.
      One Financial Plaza
      100 S.E. Third Avenue, Suite 1300
      Fort Lauderdale, Florida 33394
      Telephone:  (954) 530-5301
      **Buschel@BGlaw-pa.com**
      *(Admitted Pro Hac Vice).*

      Steven S. Biss (VSB # 32972)
      300 West Main Street, Suite 102
      Charlottesville, Virginia 22903
      Telephone:  (804) 501-8272
      Facsimile:   (202) 318-4098
      **stevenbiss@earthlink.net**
      *(Application for Admission Pro Hac Vice*
      *      To be Filed)*

      *Counsel for the Plaintiff*

58